943 A.2d 53

**In re JAMES G.**

**No. 625, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 29, 2008.

544

546

Piedad Gomez (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Michele A. Plummer (Legal Aid Bureau, Inc., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, DEBORAH S. EYLER and SHARER, JJ.

HOLLANDER, J.

In this appeal, we must consider whether the Circuit Court for Baltimore City erred when it found that the Baltimore City Department of Social Services ("DSS" or "Department"), appellee, made "reasonable efforts" to reunify James G., appellee, with his father, Mr. James G., appellant.[1] That finding led the court to change James's permanency plan from parental reunification to placement with a relative for custody and guardianship. Mr. G. challenges that ruling on appeal. He asks: "Did the court abuse its discretion in terminating the permanency plan of reunification?"[2]

For the reasons that follow, we conclude that the court erred in finding that DSS made reasonable efforts, and therefore it erred or abused its discretion in changing the permanency plan. Accordingly, we shall reverse and remand for further proceedings.

---

**1.** For clarity, we shall sometimes refer to the elder James G. as "Mr. G.," and to his son as "James." James's mother, Ms. Rhonda A., is not a party to this appeal.

**2.** Although James opposed the change in the permanency plan in the circuit court, he has filed an appellee's brief on appeal, claiming he is "equally content with relative placement and does not wish to make a choice between either of his parents or his relatives by contesting the court's decision below."

## FACTUAL AND PROCEDURAL SUMMARY

James was born on July 26, 1996, to Mr. G. and Rhonda A. He lived with his mother until March of 2004. At that time, James began to live with appellant, because Ms. A.'s drug abuse prevented her from caring for James. A few months later, on August 6, 2004, Mr. G. was arrested for a violation of parole.[3]

On August 13, 2004, the Department filed a Petition with Request for Shelter Care, alleging that James was a child in need of assistance ("CINA").[4] According to the Department, James had been "in the care of his father for the past four months," and they were "living with the father's lady friend, Deborah Holman."[5] The Petition recounted appellant's incarceration, and also noted that Ms. A., a drug abuser, was not enrolled in treatment, was living a "transient lifestyle," and could not be contacted by the Department.[6] By order of August 13, 2004, James was placed in the care of Ms. Holman pending an adjudicatory hearing.

At a hearing on September 29, 2004, the parties stipulated that James was a CINA. Appellant reported that he would be

---

3. The Department's brief describes appellant as having violated probation. However, appellant's brief and various court orders recount a parole violation. The record does not disclose the nature of appellant's parole violation or the underlying offense.

4. A CINA is a child who "requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md.Code (2006, 2007 Supp.), § 3–801(f) of the Courts & Judicial Proceedings Article (definition of "child in need of assistance"). *See also Id.*, § 3–801(g) (" 'CINA' means a child in need of assistance.").

5. Holman's surname is spelled "Holeman" in the transcript.

6. Aside from a *pro se* appearance at a hearing on April 26, 2007, discussed *infra*, Ms. A. has had no involvement in these proceedings. At a hearing on February 23, 2007, also discussed *infra*, James's case worker stated that Ms. A. was in a halfway house, had been employed for the past six months, and was "interested in getting her son. However, she's not ready at this point."

released from incarceration in October 2004.[7] Because Ms. Holman was apparently faced with loss of her Section 8 housing as of November 1, 2004, the parties jointly recommended placement of James with his aunt, Joslyn B. Accordingly, on October 8, 2004, James was adjudicated a CINA and committed to the custody of the Department, with limited guardianship granted to Ms. B.

After a review hearing on August 29, 2005, the court placed James with his paternal cousin, Angela C.[8] The court also issued an Order on that date, establishing a permanency plan of "reunification with parent or guardian," to be achieved by August 29, 2006.

A master for juvenile causes held a six-month review hearing on May 16, 2006. On May 24, 2006, pursuant to the master's recommendation, the court entered an Order continuing James's placement with his cousin, and continuing the permanency plan of reunification. However, it extended the target date for implementation until May 16, 2007.

At the next six-month review hearing, held by a master on December 12, 2006, the parties requested a "contested hearing" concerning the permanency plan. At that evidentiary hearing, held by a master on February 23, 2007, DSS sought to change James's permanency plan from parental reunification to placement with a relative for custody and guardianship.

Philomena Ukadike,[9] a DSS case worker who had been assigned to James since April 2006, was the sole witness for DSS. She reported that James was in the fourth grade, with average grades, and was receiving therapy at Kennedy Krieg-

---

7. The record does not reveal the actual date of appellant's release.

8. The record does not disclose why James was removed from Ms. B.'s care. Although court documents identify the cousin as "Angela [C.]," appellant's brief identifies her as "Denise [K.]" The earliest court order confirming James's placement with his cousin was entered on August 29, 2005. However, testimony at a later hearing indicated that James was placed in his cousin's care on July 22, 2005.

9. Ms. Ukadike's name is misspelled in both the transcript and appellant's brief as "Filomena Hugadite."

er for minor behavioral issues. Ukadike recounted that, during the period between July 2006 and December 2006, she met with appellant just once, at the cousin's home. In addition, she stated: "[H]e came to the office once to see my supervisor." According to Ukadike, DSS and appellant had executed a "service agreement," which required appellant to obtain employment and housing, and to maintain contact with James and with the Department. However, the service agreement was not placed in the record, and no evidence was presented as to the Department's obligations, if any, under the agreement.

With regard to the Department's request to change James's permanency plan, Ukadike stated: "This child came into care in 2004. This is 2007. It's over 12 months and [appellant] hasn't provided documentation for employment or housing. . . . [W]e can't do reunification at this point." She acknowledged, however, that while Ms. C. was "interested" in being certified as a foster parent, she "hasn't expressed any interest [in adoption]. She [i.e., Ms. C] is hoping that the parents will really try to have a reunification with the child." The following exchange is also pertinent:

[APPELLANT'S COUNSEL]: Now with regard to the change in plan, you're recommending that the plan be changed to limited placement for custody and guardianship.

[UKADIKE]: Yes.

[APPELLANT'S COUNSEL]: And not adoption.

[UKADIKE]: No because child [sic] is 10 years old and I do know that the child is attached to his parents especially the father.

[APPELLANT S COUNSEL]: **Other than [appellant's] lack of more stable employment—**

[UKADIKE]: **And housing.**

[APPELLANT S COUNSEL]:**—and lack of housing is there anything else that would prevent James from being returned to his father's care?**

[UKADIKE]: **No.**

[APPELLANT'S COUNSEL]: **And are you saying then that the lack of housing and the lack of adequate employment is what makes you want to change the plan from reunification to placement with a relative for custody and guardianship?**

[UKADIKE]: **Yeah because it's over two years this child has been in placement. [Appellant] you know for the past two years hasn't been able to fulfill those plans.** (Boldface added.)

As to appellant's unemployment, Ukadike stated that appellant had met with her supervisor at the DSS office, who referred appellant to one organization, People Encouraging People, "to see if they could help him." That was the only referral made by DSS. According to Ukadike, appellant "call[ed] back and said that he did go [and] that they say they couldn't help him." [10]

Ukadike claimed she had discussed the issue of appellant's unemployment with him. But, she did not specify the number of conversations or the dates of such conversations. The following exchange is relevant:

[APPELLANT'S COUNSEL]: Did you ever discuss his employment status with him?

[UKADIKE]: Yeah he told me that he's looking for employment but he doesn't have enough experience and it's difficult for him to find employment and he's coming to [an] employment agency.

[APPELLANT'S COUNSEL]: [S]o you're saying he told you he's working through a temporary agency?

[UKADIKE]: Yes, and he said it's difficult for him to work a job.

---

**10.** In its brief, DSS erroneously asserts that appellant "declin[ed] to inform the Department about his lack of employment success after it referred him to People Encouraging People," and that, "when the referral did not help, *he did not tell Ms. Ukadike,* and did not return to the Department or seek another referral from it." (Emphasis added.) As the record shows, the Department's assertions are at odds with Ukadike's testimony.

[APPELLANT'S COUNSEL]: So does the work through the temporary employment agency in your mind count as employment?

[UKADIKE]: Well he said he has shown me his check. He said he's not making money to be able to have housing or anything.

[APPELLANT'S COUNSEL]: *Did he appear to be working but just not making enough money?*

[UKADIKE]: *Well don't know if he's working. I don't know if he's working.* (Emphasis added).

Later in the hearing, Ukadike was asked whether there was "anything else that the Department of Social Services can do to help [appellant] gain more gainful employment." She responded: "I don't know."

As to housing, Ukadike explained that the Department had not provided appellant with housing assistance, because he did not have a job. She noted that, for his address, appellant had provided her with the address of his girlfriend, Ms. Holman, with whom he and James had lived prior to appellant's incarceration. Testifying over appellant's hearsay objection, Ukadike said that she had contacted Holman, who advised that appellant was not living with her.[11] But, she indicated that appellant is her friend, and that he visits to help her because she is disabled.[12] Ukadike recounted that she scheduled a home visit with Holman to assess her residence, but Holman cancelled the appointment. Ukadike offered Holman two other dates for the home visit, both of which Holman rejected. Ukadike stated that, "[o]n that note I told her when you think it's appropriate to call me and I will come for the home

---

**11.** The master ruled: "I am going to allow the testimony with the understanding that there has to be something else other than this testimony to verify this information." The only evidence produced by DSS, however, was Ukadike's testimony. Nevertheless, on the basis of this testimony, DSS asserts that appellant gave Ukadike "a false address."

**12.** Ms. Holman uses a wheelchair. Appellant testified that she has multiple sclerosis.

assessment. I didn't hear from her again." Ukadike admitted that she did not contact Holman again, nor did she contact appellant to assess his housing situation. Nevertheless, Ukadike performed a clearance on Holman for purposes of visitation between appellant and James at her home, and stated that the results were "fine."

According to DSS, appellant exercised occasional visitation with James. The following exchange is pertinent:

[DEPARTMENT'S COUNSEL]: [B]esides the Thanksgiving visit since the last review court [sic] which was in May what has been the visitation schedule that father has had with James?

[UKADIKE]: [Appellant] use [sic] to go [to the cousin's home] to visit James. Sometimes take James out and bring him because I've seen him on one or more occasion that I went on a visit he brought James over to the caretaker so I could visit with James prior to Thanksgiving you know.

[DEPARTMENT'S COUNSEL]: What was the frequency?

[UKADIKE]: There was no frequency.... [Appellant] could call the child once a week or for the next two or three weeks the child wouldn't hear from him or see him. There was no frequency.

\* \* \*

[DEPARTMENT'S COUNSEL]: And what is the visitation schedule mother is following?

[UKADIKE]: None because mother hasn't come to have a service agreement. However I've heard from the child that when the child do visit the godmother [sic] [13] mother do come over there and see the child.

[DEPARTMENT'S COUNSEL]: And how often does the [child] go to see his grandmother?

---

13. Ukadike refers to James's "godmother" at various points in the transcript. The record does not disclose the identity of the "godmother." Based on the response of the Department's counsel, we suspect transcriber error, and that Ukadike in fact referenced James's maternal grandmother.

[UKADIKE]: Every other weekend.

The following transpired on cross-examination:

[APPELLANT'S COUNSEL]: With regard to the visits [between appellant and James] are the visits supervised by Department of Social Service?

[UKADIKE]: **It was never a supervised visit, no.**

[APPELLANT'S COUNSEL]: **So you never had concerns about [appellant] mistreating his child so [as to] make you want to have supervised visits?**

[UKADIKE]: **Not to the best of my knowledge.** The only concern we have is that [on one occasion appellant] failed to return the child on time. The child missed two days of school.

[APPELLANT'S COUNSEL]: But that's information you got from the caregiver.

[UKADIKE]: And also Ms. [Holman]. And also the god-mother of the child.

[APPELLANT'S COUNSEL]: With regard to the number of visits since they're not at the agency you don't have any direct knowledge as to how many visits occur or when they occur.

[UKADIKE]: I do talk to the child. The child did tell me when he sees his father. Since November the child hasn't seen the father.

[APPELLANT'S COUNSEL]: And that's based on.

[UKADIKE]: Based on [James] not going to see the father.

[APPELLANT'S COUNSEL]: But you know this because.

[UKADIKE]: The child has said and the caretaker has said.

\* \* \*

[APPELLANT'S COUNSEL]: So the Department of Social Service has no problem with [appellant] picking up his son and visiting with his child.

[UKADIKE]: ... We don't have a problem. The reason why the visit was stopped was ... an adult was living in the home. We didn't do any supervised inspection for the

home. I didn't know anything about it you know that's why the visit was stopped. (Emphasis added.)

After Ukadike's testimony, appellant's counsel argued that the Department had not presented sufficient evidence to support a change in the permanency plan. The master disagreed, stating: "The court believes the Department of Social Services has presented a prima facie case for the court to make a determination as to whether the plan should be changed in this matter."

Appellant testified in his own behalf. He stated that he has no high school diploma, but has experience in warehousing, construction, and dishwashing, and was "out every day at least four days out of the week putting in applications" for work. His job search included placing applications with temp agencies and with the City of Baltimore. His last employment, in 2006, had been temporary. He claimed that Ukadike had never discussed employment assistance with him, although her supervisor had given him a referral "that I went to and it didn't work out." The following colloquy is relevant:

[JAMES'S COUNSEL]: You said that things did not work out with People Encouraging People?

[APPELLANT]: Yeah.

[JAMES'S COUNSEL]: What happened?

[APPELLANT]: Well they were more on the tip that they were trying to help people that maybe that had HIV or something like that helping those type of people. I told them I needed help as far as housing or jobwise or whatever and they say there was nothing they could do with me about that.

[JAMES'S COUNSEL]: And when they told you they couldn't help you did you go back to the Department of Social Services for another referral?

[APPELLANT]: No ma'am.

[JAMES'S COUNSEL]: And why not?

[APPELLANT]: Because I just went out and did my thing as far as trying to get a job on my own you know and I

guess doing what I had to do. I never went back to talk to them.

\* \* \*

[JAMES'S COUNSEL]: Did you know if anything else was available?

[APPELLANT]: Not with them but I just went out on my own like I said and tried to get a job myself and do it the way I knew how.

Appellant was also questioned concerning his visitation with James:

[APPELLANT'S COUNSEL]: How often do you talk with your son James and since last summer how frequently have you visited?

[APPELLANT]: Oh we talk on the phone a lot. He calls me. I call him.

[APPELLANT'S COUNSEL]: And when you say a lot can you give us a number? Once a week, twice a week, once a month or something like that.

[APPELLANT]: No I talk to James at least a good five times out of a week. He calls me when he get out of school. He talks to me. I call him sometimes before he goes to bed and we talk.

[APPELLANT'S COUNSEL]: And how often do you actually see him in person?

[APPELLANT]: Well I just recently seen him but before— I just recently seen him maybe what a week or two weeks ago. Before then I would call ask [sic] about seeing him but he was spending time with his grandmother on his mother's side.

[APPELLANT'S COUNSEL]: Can you visit him at his grandmother's house on his mother's side?

[APPELLANT]: I don't even—she don't talk to me and I haven't been talking to the grandmother really. When he goes over there, it's like he don't call me when he over

there. He say he just don't call when he over there or they won't let him or something like that. . . .

[APPELLANT'S COUNSEL]: Have you spoken with [the cousin] about visiting with James?

[APPELLANT]: Yeah she lets me visit with him. I use to could go get him bring him over and keep him but that's been changed now so. We still having a good thing of being together and talking.

[APPELLANT'S COUNSEL]: And do you love James?

[APPELLANT]: Yes ma'am I sure do.

[APPELLANT'S COUNSEL]: And does he appear in your view to love you too?

[APPELLANT]: Yes. We have our father and son time and our little chats. We miss each other cause we apart but when we get together he tells me he want to be with me. I want to be with him and I let him know that it's a little something going on now and we'll get together. We're gonna get it together one day so you know I'm just going with it.

On cross-examination, James's counsel asked appellant how many times he had seen James since December of 2006. Appellant responded that he had seen him "a nice amount of times. I been seeing him on and off sometimes and also talking with him."

The master then heard argument of counsel. The Department's attorney asserted:

According to Ms. [Ukadike's] testimony the respondent has been in the same placement since July of 2005. Bonding has definitely occurred. He is progressing in school. His therapeutic needs are being met. As you've heard, he does visit with his father but through all of these years with a plan of reunification the requirements of housing and employment have not been met. The Department would recognize and commend the efforts. However, we haven't had the results we need to plan properly for James and to plan for his permanency in the future.

* * *

You did hear testimony that at this time mother is not in a situation to accept reunification. Father is not in a situation to accept reunification. Accordingly, the Department is requesting that the plan be changed so that we can head in a direction to provide permanency for the respondent.

Counsel for James and appellant both opposed the Department's request for a change in the permanency plan. James's attorney argued that the Department's referral of appellant to People Encouraging People was "not . . . appropriate," and that the Department should provide further employment assistance to appellant. Appellant's lawyer echoed those arguments, stating: "We believe that the department has not made reasonable efforts to implement the permanency plan basically on the reasons she has stated."

The master stated:

. **Seems like the Department has done some things although it certainly could have done more.** It seems like the father did some things although it seems like he could've done more as well. . . . There has to be a plan and there has to be something to show that the plan is going to be fulfilled. The plan here is . . . reunification with the parent. . . . The Department of Social Services and the parents have an obligation to do something to fulfill that plan. And even if they do fulfill that plan and they do everything they're supposed to do and the plan doesn't work out . . . the court has to change the plan. Here the father says he has been looking for employment. I do believe that he has been doing everything he is supposed to do but there has to be something that's going to come out of there. It's just I looked, I looked, I looked, and I looked hard and I looked hard and nothing happened and the plan is not supposed to change. That's not the way it works. The way it works [is] I looked. I tried. The Department assisted me and **like I said the Department certainly could've done a little better than what it did.** And then I got a job

and they gave me a house and then we're all happy, but that's not happening because the first part is not being fulfilled for whatever reason. And it doesn't seem to be any time table on which those things are going to be fulfilled.... Therefore the court will unfortunately have to change the plan because the plan that we have is not moving forward.... I don't see a particular problem with ... the child visiting in the father's home except for this whole issue of inspection of the home.

Here's what we're going to do. The court will change the plan to placed with a relative for custody and guardianship. Limited custody to the Department of Social Services and the caretaker pending the next hearing. The court will find reasonable efforts in that the child is placed with a relative. That the Department is monitoring the respondent's educational needs and refer the respondent for appropriate therapy in this matter. The court will direct that the Department of Social Services and the father enter into a service agreement within 30 days and the Department of Social Services is to provide the [appellant] with appropriate employment referrals.

Within 30 days the Department of Social Service [sic] to assess where the father resides for the purposes of overnight visits with the respondent in that home. The Department says they don't have a particular problem with the child having overnights as long as the father brings the child back on time. The father is to cooperate with all visits including times for pickup and return and he is to cooperate with inspection of his current residence.

Sir, when you leave here before you leave out of the building if you could go down to there's a place called The Family Resource Center on the first floor and ask them if they know anything about some opportunities for employment before you leave here okay?

\* \* \*

I really do want ... you to have an opportunity for you to have your child returned to you but you at least got to have some employment and keep it okay? (Emphasis added.)

On the day of the hearing, February 23, 2007, the juvenile master submitted a recommended order to the court. It summarized the hearing testimony, and stated:

Although the father appears to be making some effort to attempt to comply with the requirements to have the respondent placed in his car[e], there appears to be no timetable for which these goals can be achieved. The court must fashion a permanency plan for the respondent that is both practicable and realistic. The court will therefore change the plan to placement with a relative for custody and guardianship or adoption.

\* \* \*

The permanency plan for James until this hearing has been reunification with parent or guardian. Baltimore City Department of Social Services made the following reasonable efforts with the parent/guardian in support of this plan: entered into a service agreement, referred child(ren) for therapeutic services and plac[e]ment in the home of a relative thereby strengthening family ties, monitoring the respondent's education. [E]ffective today the permanency plan is changed to placement with a relative for adoption [or] custody and guardianship. The implementation of the permanency plan shall be achieved by 6/23/07.

\* \* \*

The Baltimore City Department of Social Services has complied with the permanency plan.

\* \* \*

BCDSS and the father shall enter into a new service agreement within 30 days.

BCDSS shall provide the father with appropriate employment referrals.

On February 27, 2007, appellant filed Exceptions, along with a request for hearing. He challenged the proposed change in the permanency plan and the proposed finding that the De-

partment made reasonable efforts with regard to reunification. On March 5, 2007, the court adopted the master's proposed order as its Order.

The hearing on Exceptions was held on April 26, 2007. The court noted that the change of permanency plan to include adoption was not consistent with the transcript of the proceedings before the master, stating: "I think the adoption was a mistake. I don't think that's what Master Sampson intended to put in there. It was custody and guardianship." The court then asked appellant's counsel: "[I]f there was a concurrent plan of reunification does that change the position of your client?" Appellant's counsel responded: "[I]t might change the argument somewhat because the main reason that this was filed was because this did say adoption; and that's a pretty drastic change." Counsel for the Department resisted the suggestion of a concurrent plan. The following colloquy ensued:

[DEPARTMENT'S COUNSEL]: We would have issue with a concurrent plan of reunification. That is different as I see it from a secondary plan of reunification which is essentially always a plan with the Department to continue working with parents who wish to continue. [In m]y way of thinking concurrent is a plan running right along side in first place with placement with a relative for custody and guardianship and requires the Department to take the same action toward that plan as it would take if it were the only plan. And we were looking to move on to a different permanency plan, one which would satisfy [James's] needs as the child . . . [ellipsis in original].

THE COURT: I thought we were getting away from these primary and secondary. I thought they were . . . [ellipsis in original].

[DEPARTMENT'S COUNSEL]: No, that is the mandate from the federal government, for the Department, that's the setup that the Department follows the concept of I believe, concurrent, as I see it exists in the courtroom and with this Court and in orders, but is often what the Department conceptualizes as the role.

THE COURT: Okay.

[DEPARTMENT'S COUNSEL]: Secondary is backup.

The Department's attorney also informed the court that, since the hearing before the master, the Department had assessed Ms. Holman's home and permitted overnight visits there between appellant and James.

James's attorney asked the court to continue the plan of reunification. She said,:

> [W]e are asking that the permanency plan ... remain reunification or, in the alternative, for it to be a concurrent plan of relative placement for custody and guardianship along with reunification. Our main goal is to really keep reunification as part of the permanency plan in order for the Department of Social Services to continue to provide services to either mother or father toward the goal of reunification.

> \* \* \*

> I do believe that there are other services out there that the Department could have referred [appellant] to but when he came before the Court, Ms. Ukadike said that she didn't know what other services she could have referred him to, she didn't know if there were any other services. [Appellant] says to me that the Department did not really make reasonable efforts to look for any other services. I cannot believe that there are not other agencies out there that would assist [appellant] with ... the obstacles that he has, such as being an ex-convict ... as well as the fact that he doesn't have a high school diploma. . . .

> \* \* \*

> I really [think] that if we were to change the plan to relative placement, what we are really doing is having James stay with his Aunt under the guise of relative placement for custody and guardianship; but in fact, it's going to be really long-term foster care and there would be no effort by the Department to help mother and father to regain

unification. They are going to be left trying to get that on their own.

■ On April 26, 2007, the court issued an Order stating that "the existing Orders were sufficient for the present," and that it would hold "the decision in this case Sub Curia" and "file an order in the future." The promised Order followed on May 10, 2007. It provided:

**The BCDSS has made reasonable, although certainly not exemplary, efforts to achieve reunification.** The permanency plan for James until this hearing has been reunification with a parent or guardian. Baltimore City Department of Social Services made the following reasonable efforts with the parent/guardian in support of this plan: entered into a service agreement, referred Respondent for therapeutic services and placement in the home of a relative thereby strengthening family ties, monitored Respondent's father's employment and monitored the respondent's education.

**Certainly, more could have been done to help Respondent's father get a job, which would in turn have helped with getting housing.** However, given the length of time Respondent has been removed from the home, Master Sampson's statement that the changing of the plan is "both practicable and realistic" is a sound conclusion. Respondent has been out of the home for 22 months, *see* 42 U.S.C. 675(5)(F). Nevertheless, and even though the plan will be changed to placement with a relative for custody and guardianship, **BCDSS must make more aggressive efforts to help [appellant] obtain employment.**

\* \* \*

**Plan changed from reunification to placement with a Relative for Custody and Guardianship.**

Exception as to the recommendation by Master Sampson that the plan change from one of reunification to relative placement is not sustained. However, Master Sampson's recommendation that the new plan include one of placement

with a relative for ADOPTION is not accepted simply because that appears to be an oversight since Master Sampson, on the record, clearly did not envision adoption by Respondent's cousin as one of the plans. Therefore, the plan does not include that of adoption by a relative. (Emphasis added.)

This appeal followed.[14]

## DISCUSSION

### I.

Appellant complains that the court erred or abused its discretion "in terminating the permanency plan of reunification." In support of his position, appellant argues that the court erred in its underlying finding that DSS made reasonable efforts to achieve reunification. Further, appellant contends that, given the failure of DSS to make reasonable efforts to assist him in finding employment and housing, his lack of both did not justify a change in the permanency plan.

According to appellant, "[i]t strains credulity that 'reasonable efforts' can constitute a single referral to assist a parent who has little education as well as a criminal record find a job." Although appellant concedes that the Department "is not required to make reasonable efforts where attempts at reunification would obviously be futile," he contends that "this clearly was not such a case." Appellant continues:

In circumstances such as those presented here, that do not involve physical abuse or harm to the child, the law does

14. The Order of May 10, 2007, is appealable pursuant to § 12–303(3)(x) of the Courts & Judicial Proceedings Article. *See In re Damon M.*, 362 Md. 429, 438, 765 A.2d 624 (2001) ("[A]n order amending a permanency plan calling for reunification to foster care or adoption is immediately appealable.") *See also In re Billy W.*, 386 Md. 675, 691–92, 874 A.2d 423 (2005) (modification of a permanency plan is appealable under C.J. § 12–303(3)(x) where it "operates to either deprive [the parent] of the care and custody of her children or change the terms of her care and custody of the children to her detriment"). An order changing a permanency plan is subject to overall review for abuse of discretion. *In re Yve S.*, 373 Md. 551, 583, 819 A.2d 1030 (2003).

not permit the Department to be passive when it removes children from their parents' custody. The law requires the Department to bring its skills, experience, and resources to bear in a reasonable way to bring about reunification. Part of the social worker's role is to assist the parent in following the service plan. The Department simply did not present evidence that it did so in this case.

DSS counters that the court "had ample evidence to find that the plan of reunification was no longer viable." It highlights that, at the time of the hearing, James had been in DSS's custody for over two years. In its view, appellant "inappropriately urges lingering foster care over permanence and as such is wholly at odds with the permanency planning review process that was established by federal mandate." DSS concludes: "Securing James a placement with a paternal relative was a proper exercise of the court's discretion, for it placed James's best interest at the forefront by affording him permanency."

With regard to the reasonable efforts issue, DSS maintains that appellant "abdicated his role in partnering with the Department to find steady employment and housing by declining to make contact with the Department until December 2006; giving caseworkers a false home address; and declining to inform the Department about his lack of employment success after it referred him to People Encouraging People." Claiming that "[t]he State is not obliged to find employment for the parent," DSS contends that, "[i]n light of [appellant's] failure to work with the Department, and given his unilateral, unsuccessful approach to finding employment, the court correctly found that the Department's [single] referral to People Encouraging People was a reasonable effort to assist [appellant] in finding and maintaining employment."

James does not repudiate the position he advanced below, *i.e.*, that the Department failed to make reasonable efforts in support of reunification. Nevertheless, he contends that the court's Order effectively addressed the Department's previous

lapses, and thus the court acted within its "broad discretion" in altering his permanency plan. James explains:

This case underscores how resolving CINA cases in the best interest of the child involved may require courts to craft practical solutions to familial problems. It also reflects how the passage of time or circumstances may cause a child to change his views about the plan that most suits his current needs.

\* \* \*

The court's order reflects, at the very least, a concern that the Department needed (and continues to need) to provide employment assistance, and is an effort to ensure that the father gets that important assistance. If the Department fails to take those steps, James or the father can seek to enforce the court's order through contempt proceedings. If those services succeed and the father can stabilize his situation, the court will be able to reassess its permanency plan order and reconsider the appropriateness of reunification. If the father is unable to achieve sufficient stability to warrant reunification even after receipt of those services, James will continue to live with his relatives to whom the Department will have provided additional services to attain permanence for James.

\* \* \*

By ordering the Department to "make more aggressive efforts to help Mr. G. obtain employment," the court has actually provided James with more possibilities for permanency. Under the court's order, the Department must now seek a relative placement while continuing to assist the father to overcome the barrier that has prevented reunification. The court's decision is clearly in James' best interest as it requires the Department to help the father overcome barriers to reunification, while at the same time ensuring that James has stable placement with a relative if reunification is unsuccessful.

**568**

## II.

■ In Maryland, when a child is removed from the home for health or safety reasons and put in an out-of-home placement, the court must establish a permanency plan for the child. Maryland Code (2006, 2007 Supp.), § 3–823(b) of the Courts and Judicial Proceedings Article ("C.J."). Pursuant to C.J. § 3–823(a), "out-of-home placement" is defined in accordance with Maryland Code (2006 Repl.Vol., 2007 Supp.), § 5–501 of the Family Law Article ("F.L."). Under F.L. § 5–501(m), it means "placement of a child into foster care, kinship care, group care, or residential treatment care." [15]

Pursuant to C.J. § 3–823(e), the permanency plan for such a child may be one of the following, in descending order of

---

**15.** The Department of Health and Human Services ("HHS") has defined "foster care" by regulation, 45 C.F.R. § 1355.20(a)(2007) (italics in original):

> *Foster care* means 24–hour substitute care for children placed away from their parents or guardians and for whom the State has placement and care responsibility. This includes, but is not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child care institutions, and preadoptive homes. A child is in foster care in accordance with this definition regardless of whether the foster care facility is licensed....

In adopting this definition, HHS explained, 55 F.R. 39539, 39545 (1990):

> Because definitions often vary from State to State, ["foster care" is] defined so as to assure consistency in usage and understanding across States.... The definition of "foster care" encompasses all out-of-home, 24 hour, substitute care for children under the responsibility and care of the title IV–B/IV–E agency regardless of who provides the substitute care, whether or not there is a State payment, or whether or not the foster care facility is licensed.

Thus, James's placement in the care of his cousin meets the federal definition of "foster care," although the cousin is not licensed as a foster parent and, under Maryland law, James is considered to be in "kinship care" rather than foster care. *Compare* F.L. § 5–501(g) (" 'Foster care' means continuous 24–hour care and supportive services provided for a minor child placed by a child placement agency in an approved family home.") *with* F.L. § 5–501(i) (" 'Kinship care' means continuous 24–hour care and supportive services provided for a minor child placed by a child placement agency in the home of a relative related by blood or marriage....").

priority, and "to the extent consistent with the best interests of the child":

1. Reunification with the parent or guardian;

2. Placement with a relative for:

A. Adoption; or

B. Custody and guardianship . . .;

3. Adoption by a nonrelative;

4. Custody and guardianship by a nonrelative . . .; or

5. Another planned permanent living arrangement that:

A. Addresses the individualized needs of the child . . . and

B. Includes goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life. . . .

C.J. § 3–823(e)(2) directs: "In determining the child's permanency plan, the court shall consider the factors specified in [F.L.] § 5–525(e)(1). . . ." In turn, F.L. § 5–525(e)(1) provides:

In developing a permanency plan for a child in an out-of-home placement, the local department shall give primary consideration to the best interests of the child. The local department shall consider the following factors in determining the permanency plan that is in the best interests of the child:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.[16]

■ Of import here, F.L. § 5–525(d)(*l*) requires the Department to make "reasonable efforts" in support of a permanency plan of parental reunification established under C.J. § 3–823(e)(1). F.L. § 5–525(d)(1) provides:

**§ 5–525. Out–of–home placement and foster care—In general.**

\* \* \*

(d) *Reasonable efforts.*—(1) Unless a court orders that reasonable efforts are not required [17] . . . *reasonable efforts shall be made* to preserve and reunify families:

(i) prior to the placement of a child in an out-of-home placement, to prevent or eliminate the need for removing the child from the child's home; and

(ii) *to make it possible for a child to safely return to the child's home.*

(2) In determining the reasonable efforts to be made and in making the reasonable efforts described under paragraph (1) of this subsection, the child's safety and health shall be the primary concern.

(Emphasis added).

■ The court is also required to review the permanency plan at least every six months, until commitment is rescinded. C.J. § 3–823(h). C.J. § 3–823(h)(2) and (h)(3) are relevant:

---

**16.** In considering a petition for guardianship of a child and termination of parental rights, F.L. § 5–323(d)(1) specifically instructs the court to consider "the extent, nature, and timeliness" of reunification services offered by the local department, and whether the local department has fulfilled its obligations under the service agreement. The statute does not, however, make such an explicit mandate when the court merely considers a change in the permanency plan.

**17.** A court may determine that reasonable efforts are not required in certain circumstances not presented by the case *sub judice,* such as when the parent has subjected the child to chronic abuse or chronic and life-threatening neglect, or has committed a crime of violence against the child or a sibling or parent of the child. *See* C.J. § 3–812; F.L. § 5–323(d)(3).

## § 3–823. Permanency plan for out-of-home placement.

\* \* \*

(h) *Periodic reviews.—*

\* \* \*

(2) At the review hearing, the court shall:

(i) Determine the continuing necessity for and appropriateness of the commitment;

(ii) Determine and document in its order whether reasonable efforts have been made to finalize the permanency plan that is in effect;

(iii) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv) Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

(v) Evaluate the safety of the child and take necessary measures to protect the child; and

(vi) Change the permanency plan if a change in the permanency plan would be in the child's best interest.

(3) Every reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement.

The Court of Appeals discussed the role of the permanency plan in CINA cases in *In re Damon M.,* 362 Md. 429, 765 A.2d 624 (2001), and noted that the plan, once established, may not be changed unless the court first determines that "it is in the child's best interest to do so...." *Id.* at 436, 765 A.2d 624. It said, *id.:*

The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal to which the parties and the court are committed to work. It sets the

tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the child's best interest. These are the reasons, no doubt, that the court is charged with determining the plan and with periodically reviewing it, evaluating all the while the extent to which it is being complied with.

What the Court said in *In Re Yve S.*, 373 Md. 551, 819 A.2d 1030 (2003), also provides guidance:

As *In re: Damon M.* observes, the purpose of a permanency plan is to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation. Once set initially, *the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed.* It is not the purpose of the initial permanency plan hearing, however, to resolve all issues involved in that final resolution. If that were the case, there would be no need for review of how, on a regular basis, the plan is progressing or not. Also as *In re: Damon M.* indicates, the initial permanency plan hearing is to be held and conducted expeditiously. Protracted proceedings in establishing the initial plan defeat the purpose of the statute. The statute presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent.

*Id.* at 582, 819 A.2d 1030 (emphasis added.)

The "reasonable efforts" requirement set forth in F.L. § 5-525(d) has its genesis in federal law, with the enactment of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), Pub.L. No. 96–272, 94 Stat. 500. *See* 42 U.S.C.

§§ 620–29i & §§ 670–79b (2000, 2004 Supp.) (present codifica-
tion of AACWA as amended, consisting of 42 U.S.C. Chapter
7, subchapters IV–B and IV–E, also known as Titles IV–B and
IV–E of the Social Security Act); 45 C.F.R. parts 1355–57
(2007).[18] *See also* Kathleen S. Bean, *Reasonable Efforts:
What State Courts Think*, 36 U. Tol. L.Rev. 321 (2004–2005)
("Bean"). AACWA "was passed after five years of congres-
sional testimony that highlighted the fact that a staggering
number of children . . . were . . . residing in foster care."
Bean, 36 U. Tol. L.Rev. at 324. According to Bean, AACWA
"was designed with a focus on family preservation and reunifi-
cation. [It] sought to end the stagnation [of] keeping children
in foster homes by requiring states to make reasonable efforts
to reunite families." *Id.* at 325.

AACWA "represented a significant change in federal sup-
port for state intervention and the nation's [child protective
services] systems." Will L. Crossley, *Defining Reasonable
Efforts: Demystifying the State's Burden under Federal
Child Protection Legislation*, 12 B.U. Pub. Int. L.J. 259, 269
(2002–2003) ("Crossley"). Crossley notes, *id.* at 270: "Before
1980, the federal government reimbursed states for foster care
expenses but did not offer comparable financial support for
adoption or prevention and reunification services." He adds,
*id.:*

As passed in 1980, [AACWA] continued to reimburse
states for foster care maintenance payments [19] while offer-
ing additional funding for child protection, family interven-
tion, and adoption services for children with special needs.
[AACWA], however, conditioned all such funding on state

---

**18.** F.L. § 5–525 is one of several provisions that Maryland enacted to
comply with requirements for funding under the federal foster care
maintenance payments, adoption assistance, and child and family ser-
vices grant programs (also known as the Title IV–B and IV–E pro-
grams).

**19.** "Foster care maintenance payments" include the cost of "food,
clothing, shelter, daily supervision, school supplies, a child's personal
incidentals, liability insurance with respect to a child, and reasonable
travel to the child's home for visitation." 42 U.S.C. § 675(4)(A).

compliance with certain federal requirements. Part E of Title IV of [AACWA] required states to have an approved plan for administering child protective services.

With regard to "reasonable efforts," Crossley explains, *id.* at 270–72 (emphasis added; footnotes omitted):

> *Each state's plan must provide, among other things, that "in each case, reasonable efforts will be made* (A) prior to placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) *to make it possible for the child to return to his home."* [*See* 42 U.S.C. § 671(a)(15)(B) (current amended codification of quoted language).] *This provision of [AACWA] became commonly known as the "reasonable efforts" provision.*
>
> * * *
>
> *To address the foster care problem, Congress required states to make reasonable efforts at two specific points along the child protective services continuum: before removal and during foster care placement....* By creating a new Title IV–B that restricted foster care maintenance and adoption assistance expenses, [AACWA] also pushed states to focus more on preservation and reunification services. Thus, on the surface, *reasonable efforts quite simply had to do with the quality of preservation services given before foster care placement and the quality of reunification services provided during foster care placement.* Both services promoted [AACWA's] goal of reducing the number of children in foster care.

In *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 642 A.2d 201 (1994) (*"Ivan M."*), the Court discussed the development of AACWA:

> During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as "foster

care drift" and resulted in the enactment by Congress of [AACWA]. One of the important purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

Under the federal act, a state is required, among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payment. *The case plan must include ... a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home* or to establish another permanent placement for the child. The state must also implement a case review system that provides for ... judicial review.... The purpose of the judicial review is to "determine the future status of the child" including whether the child should be returned to its biological parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster care on a long term basis.

*Id.* at 104–105, 642 A.2d 201 (internal citations omitted; emphasis added). *See also In Re Yve S.*, 373 Md. at 574–76, 819 A.2d 1030 (same).

In 1997, Congress revised AACWA through the enactment of the Adoption and Safe Families Act of 1997 ("ASFA"), Pub.L. No. 105–89, 111 Stat. 2115 (codified in 42 U.S.C. Chapter 7, subchapters IV–B and IV–E). As Bean explains, the revisions were enacted largely in response to growing criticisms directed at the "reasonable efforts" requirement, which included

charges that children were still in foster homes too long. The charge was that they lingered now, not because of agency inaction, but because agencies were engaged in excessive efforts to "repair hopelessly dysfunctional families. Instead of the permanency intended by the federal *reasonable efforts* clause, impermanency result[ed]." Perhaps of even greater concern, however, was the perception

that children were being reunited with parents when it was not safe to do so in the name of reasonable efforts.

Bean, 36 U. Tol. L.Rev. at 326 (footnote omitted).

Despite congressional concern about children enduring prolonged foster care, Congress did not entirely eliminate the "reasonable efforts" requirement. Rather, it revised the obligation, so that children "were no longer doomed to spend their years waiting for reunification efforts...." *Id.* Bean explains, *id.* (footnotes omitted):

> In 1997, after again looking at the child protection system, Congress sought to clarify "reasonable efforts" and respond to concerns that AACWA had encouraged states to go too far in preserving parent-child relationships that were more harmful than beneficial. It did so in ASFA, primarily by making the child's health and safety "paramount." In line with this change, permanency for children moved to the forefront. Under ASFA, children were no longer doomed to spend their years waiting for reunification efforts to make their homes safe. Some situations were exempted from the reasonable efforts requirement, the time period for making reunification efforts was shortened, and adoption was encouraged. If efforts to reunite parent and child were not effective within a limited time, parental rights were to be terminated and adoption sought.

 Under Title IV–B and IV–E, as amended by ASFA, in order to receive federal funding, a state is required to implement a federally-approved state plan for the delivery of child welfare services, which, in relevant part, must provide that "reasonable efforts shall be made to preserve and reunify families ... to make it possible for a child to safely return to the child's home," if such efforts are consistent with the permanency plan for the child. 42 U.S.C. § 671(a)(15)(B). However, ASFA also mandates that, "in determining reasonable efforts to be made with respect to a child ... and in making such reasonable efforts, the child's health and safety shall be the paramount concern." *Id.,* § 671(a)(15)(A). Therefore, when continuation of reunification efforts is incon-

sistent with the permanency plan, the state plan must provide for completion of "whatever steps are necessary to finalize the permanent placement of the child...." *Id.,* § 671(a)(15)(C).

As indicated, a state, such as Maryland, that implements a federally approved plan may receive reimbursement for a percentage of the maintenance payments expended by the state for foster care. 42 U.S.C. § 674(a)(1). For an involuntary out-of-home placement to qualify for federal reimbursement funding, however, there must be "a judicial determination to the effect that ... reasonable efforts" to reunify the family or finalize the permanency plan "have been made," *id.,* § 672(a)(2)(A)(ii) (as amended by the Deficit Reduction Act of 2005, Pub.L. No. 109–171, 120 Stat. 4, § 7404), or that reasonable efforts need not be made, under exceptions not relevant here. *Id. See also* 42 U.S.C. § 671(a)(15)(D) and note 17, *supra* (describing exceptions to reasonable efforts requirement).

Federal regulations concerning the Title IV–B and IV–E programs articulate specific instructions to the states concerning the "reasonable efforts" requirement. Federal regulations require, for example, that "judicial determinations regarding ... reasonable efforts to finalize the permanency plan in effect, including judicial determinations that reasonable efforts are not required, must be explicitly documented and must be made on a case-by-case basis and so stated in the court order." 45 C.F.R. § 1356.21(d) (2007). Further, 45 C.F.R. § 1356.21(b) (2007) provides:

(b) *Reasonable efforts.* The State must make reasonable efforts to maintain the family unit and prevent the unnecessary removal of a child from his/her home, as long as the child's safety is assured; to effect the safe reunification of the child and family (if temporary out-of-home placement is necessary to ensure the immediate safety of the child); and to make and finalize alternate permanency plans in a timely manner when reunification is not appropriate or possible.... In determining reasonable efforts to be made with respect to a child and in making such reasonable efforts, the

child's health and safety must be the State's paramount concern.

* * *

(2) *Judicial determination of reasonable efforts to finalize a permanency plan.* (i) The State agency must obtain a judicial determination that it has made reasonable efforts to finalize the permanency plan that is in effect (whether the plan is reunification, adoption, legal guardianship, placement with a fit and willing relative, or placement in another planned permanent living arrangement) within twelve months of the date the child is considered to have entered foster care ... and at least once every twelve months thereafter while the child is in foster care.

(ii) If such a judicial determination regarding reasonable efforts to finalize a permanency plan is not made ... the child becomes ineligible under title IV–E at the end of the month in which the judicial determination was required to have been made, and remains ineligible until such a determination is made.

Notably, despite the federal requirement for "reasonable efforts," it is not a defined term under federal law, either by statute or by regulation. In its Notice of Proposed Rulemaking in regard to the implementation of ASFA, HHS rejected calls for a definition of "reasonable efforts." It explained, 63 F.R. 50057, 50073 (1998):

During our consultation with the field, some recommended that we define reasonable efforts in implementing the ASFA. We do not intend to define "reasonable efforts." To do so would be a direct contradiction of the intent of the law. The statute requires that reasonable efforts determinations be made on a case-by-case basis. We think any regulatory definition would either limit the courts' ability to make determinations on a case-by-case basis or be so broad as to be ineffective. In the absence of a definition, courts may entertain actions such as the following in determining whether reasonable efforts were made:

* * *

- Was the service plan customized to the individual needs of the family or was it a standard package of services?
- Did the agency provide services to ameliorate factors present in the child or parent, i.e., physical, emotional, or psychological, that would inhibit a parent's ability to maintain the child safely at home?
- Do limitations exist with respect to service availability, including transportation issues? If so, what efforts did the agency undertake to overcome these obstacles? [20]

* * *

Typically, State child welfare agencies and the courts encounter cases in which it is appropriate to make reasonable efforts to prevent a child's removal from home or to reunify the family. Quite frequently, though, States are faced with circumstances in which it is unclear how much effort is reasonable. At the initial stage of and throughout its involvement with a family, the child welfare agency assesses the family's needs and circumstances. The State agency should make reasonable efforts to prevent the child's removal from home or to reunify the family commensurate with the assessment.

In 1998, the General Assembly adopted ASFA to comply with the federal law. *See* 1998 Md. Laws, ch. 539 ("[T]o provide certain reunification services and concurrently develop

---

**20.** In its final rulemaking, HHS observed that it had received comments suggesting elimination of the illustrative list, because of concern that it would be come "de facto policy." Conversely, it was also suggested that the list be expanded and included in the regulatory text to provide further guidance. 65 F.R. 4019, 4051 (2000). HHS rejected both ideas, stating, *id.*:

We intend for examples to set parameters for the appropriate use of the flexibility that is inherent in some title IV–E provisions. We believe the examples will be helpful to State child welfare agencies in preparing for hearings at which reasonable efforts determinations are to be made. We do, however, think the list is more appropriate as policy guidance rather than regulatory text and therefore, did not change the regulation to include the examples.

and implement a certain permanency plan[.]"). In *In re Karl H.*, 394 Md. 402, 906 A.2d 898 (2006), the Court explained: "The purpose of [ASFA] was to streamline the foster care placement process and provide permanent homes for children in foster care, by expediting permanency planning hearings and TPR proceedings. Further, the presumption of [ASFA] is that if reunification efforts fail the preferred result is adoption." *Id.* at 421, 906 A.2d 898 (internal citations omitted). In a footnote, the Court added, *id.* at 420 n. 15, 906 A.2d 898: "Generally, [ASFA] is designed to promote the adoption of children in foster care. To that end, [ASFA] provides that a child's health and safety are paramount in determining whether reasonable efforts to preserve the family had been undertaken."

The *Karl H.* Court also said, 394 Md. at 420 n. 15, 906 A.2d 898:

The Legislature was aware that enactment of

[t]he bill could result in more court decisions to terminate parental rights and a more expedient TPR process, thereby allowing children to spend less time in foster care and be adopted more rapidly.

\* \* \* \* \* \*

In addition, the bill's provision for time-limited reunification efforts would limit provision[s] of reunification services to 15 months under specified circumstances, resulting in an indeterminate but significant amount of savings.

[Department of Legislative Services, Fiscal Note, H.B. 1093 at 5, 6 (1998).]

\* \* \*

The Legislative Floor Report indicates that, "[t]he bill also establishes that reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with the reasonable efforts to reunify the family." Department of Legislative Services, Floor Report, H.B. 1093 at 1 (1998).

As we have seen, the "reasonable efforts" requirement embodied in F.L. § 5–525(d) (requiring that "reasonable efforts shall be made" to reunify families) derives from federal law, but "reasonable efforts" is an undefined term in the statutory scheme. Instead, the meaning and implementation of the reasonable efforts requirement is the province of the states. In *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court ruled that private parties cannot sue under Titles IV–B and IV–E to enforce the federal reasonable efforts requirement, in part because of the statute's silence as to the meaning of "reasonable efforts." *Id.* at 363–64, 112 S.Ct. 1360. The Supreme Court observed: "No further statutory guidance is found as to how 'reasonable efforts' are to be measured.... [I]t is a directive whose meaning will obviously vary with the circumstances of each individual case. How the State was to comply with this directive ... was, within broad limits, left up to the State." *Id.* at 360, 112 S.Ct. 1360.

In contrast to ASFA, which does not define "reasonable efforts," the General Assembly has defined "reasonable efforts" in the Courts and Judicial Proceedings Article. C.J. § 3–801(v) defines "reasonable efforts" as "efforts that are reasonably likely to achieve the objectives set forth in [C.J.] § 3–816.1(b)(1) and (2)," which consist of "prevent[ing] placement of the child into the local department's custody," C.J. § 3–816.1(b)(1) and, for children who are placed in State custody, "[f]inaliz[ing] the permanency plan in effect for the child," C.J. § 3–816.1(b)(2)(i), and "[m]eet[ing] the needs of the child, including the child's health, education, safety, and preparation for independence." C.J. § 3–816.1(b)(2)(ii).

Maryland regulations for out-of-home placements provide some insight into the contemplated range of reunification services. Code of Maryland Regulations ("COMAR") 07.02.11.14(A) states: "To the extent that funds and other resources are available, a range of services that will facilitate or maintain successful reunification of the child shall be" provided by the local department, or, of relevance here, made

available through referral to other appropriate agencies. CO-MAR 07.02.11.14(B) continues:

> The types of services which may be purchased, provided, or accessed through referral to another agency may include, but are not limited to:

> \* \* \*

> (2) Rent deposits;

> \* \* \*

> (4) Vocational counseling or training;

> \* \* \*

> (9) Assistance to locate housing;

COMAR 07.02.11.15(F)(4) is also relevant. It includes in the "minimum" requirements for a service agreement between the Department and a parent "[a] list of the services and supports that the caseworker and the local department shall provide to assist the parents or legal guardian and the child, as appropriate to the case plan, as well as the time frames in which these services will be provided...."

In accordance with federal requirements, C.J. § 3–816.1(b)(2) provides that, at each six-month permanency plan review hearing, the court is required to "make a finding whether a local department [of social services] made reasonable efforts" to finalize the permanency plan in effect for the child. The court must also require the local department to "provide evidence of its efforts" before it makes its finding. C.J. § 3–816.1(b)(4). Further, the court must "assess the efforts made since the last adjudication of reasonable efforts and may not rely on findings from prior hearings." C.J. § 3–816.1(b)(5).

C.J. § 3–816.1(c) directs the court to consider several factors in making its reasonable efforts determination, including the following:

(1) The extent to which a local department has complied with the law, regulations, state or federal court orders, or a stipulated agreement accepted by the court regarding the provision of services to a child in an out-of-home placement;

(2) Whether a local department has ensured that:

(i) A caseworker is promptly assigned to and actively responsible for the case at all times;

(ii) The identity of the caseworker has been promptly communicated to the court and the parties; and

(iii) The caseworker is knowledgeable about the case and has received on a timely basis all pertinent files and other information after receiving the assignment from the local department;

*(3) [W]hether a local department has provided appropriate services that facilitate the achievement of a permanency plan for the child;*

(4) Whether the child's placement has been stable and in the least restrictive setting appropriate, available, and accessible for the child during the period since the most recent hearing held by the court.... (Emphasis added.)

In its review, "the juvenile court is not making findings about past facts that may constitute a basis for court intervention...." *In re Ashley E.*, 158 Md.App. 144, 161, 854 A.2d 893 (2004), *aff'd*, 387 Md. 260, 874 A.2d 998 (2005). Rather, it must decide "the appropriate form of court-sanctioned intervention for the child, by reviewing the permanency plan for the child as originally established in the disposition hearing and assessing the status of the plan and whether it still serves the best interest of the child or needs to be changed to accomplish that goal." *Id.*

Quite obviously, "a court may not consider a potential loss of federal funding for placement of a child that may result from a determination that reasonable efforts were not made." C.J. § 3–816.1(d). Additionally, if the court finds that reasonable efforts were not made, it must make its findings in writing, and send them to the director of the local department, the Social Services Administration, the State Citizens Review

Board for Children, any local citizens review panel, and "[a]ny individual or agency ... responsible for monitoring the care and services provided to children in the legal custody or guardianship of the local department on a systemic basis." C.J. § 3–816.1(f).

To be sure, "it is the courts that must apply these provisions to the circumstances of individual cases...." Bean, 36 U. Tol. L.Rev. at 331. By making federal funding contingent upon judicial determinations of whether reasonable efforts have been made, the federal legislative scheme places state courts- and ultimately state appellate courts-in a position of regulatory oversight with regard to the "reasonable efforts" of local child welfare agencies.

Few reported Maryland decisions have addressed the import of the "reasonable efforts" requirement in the context of a court's change in a permanency plan from parental reunification to relative placement.[21] Rather, the cases have more

---

21. In *In re Ashley E., supra,* 158 Md.App. 144, 854 A.2d 893, we rejected the mother's contention that the local department did not make reasonable efforts toward reunification. We upheld a change of permanency plan from reunification to termination of parental rights, where the mother had subjected her children to pervasive sexual abuse. We discuss the case in more detail, *infra.*

Several other reported decisions have emerged from appeals of changes to permanency plans, but they have not directly addressed the "reasonable efforts" determination. *See In re Karl H., supra,* 394 Md. 402, 906 A.2d 898 (holding "that a concurrent permanency plan ordered at the time of the permanency planning hearing and which provides for both reunification and adoption is an appealable interlocutory order," but not ruling on the merits of the permanency plan); *In re Samone H.,* 385 Md. 282, 869 A.2d 370 (2005) (holding that a denial of a request to change a permanency plan is not appealable); *In re Yve S., supra,* 373 Md. 551, 819 A.2d 1030 (reversing change of permanency plan where court did not adequately consider likelihood of harm to child and improperly relied on equivocal expert testimony); *In re Damon M., supra,* 362 Md. 429, 765 A.2d 624 (holding that change of permanency plan was appealable, but not ruling on the merits of the permanency plan); *In re Caya B.,* 153 Md.App. 63, 834 A.2d 997 (2003) (affirming change of permanency plan where mother was unfit to have custody, without addressing reasonable efforts); *In re Norberto C.,* 133 Md.App. 558, 758 A.2d 637 (2000) (vacating change of permanency plan where court did not hold hearing to determine whether change was in child's best interest). *See also In re Nicole B.,* 175 Md.App. 450,

commonly arisen out of termination of parental rights ("TPR") proceedings. As the Court of Appeals recently observed, however, TPR cases are " 'different in kind and not just in degree' " from other child access proceedings. *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 496, 937 A.2d 177 (2007) (quoting *Shurupoff v. Vockroth,* 372 Md. 639, 657, 814 A.2d 543 (2003)).

Cases pitting parents against the State with respect to the care and custody of children proceed against the backdrop of the "fundamental, Constitutionally-based right [of parents] to raise their children free from undue and unwarranted interference on the part of the State, including its courts." *Id.* at 495, 937 A.2d 177.[22] Such cases are unlike private custody disputes between parents, which are resolved solely on the basis of the best interest of the child. *Id.* As the *Rashawn* Court explained, in a dispute between a parent and the State the constitutional rights of parents are "harmonized" with the best-interests-of-the-child standard "by recognizing a substantive presumption—a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents." *Id.* The presumption may be rebutted "upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *Id.*

---

927 A.2d 1194 (2007) (in permanency plan review case, applying the federal Indian Child Welfare Act, which preempts the ASFA "reasonable efforts" requirement with a requirement that the local department make "active efforts" toward reunification of Native American children with their families).

**22.** In many cases, including *In re Samone H., supra,* 385 Md. at 299–301, 869 A.2d 370, and *In re Yve S., supra,* 373 Md. at 565–68, 819 A.2d 1030, the Court has discussed the fundamental rights of parents. In *Samone II.,* for example, the Court said: "[A] parent's interest 'occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. [Far] more precious than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men....' " 385 Md. at 299, 869 A.2d 370 (internal citations omitted).

We are mindful that TPR cases are an imperfect guide to our review of a juvenile court's decision to alter a permanency plan from reunification to relative placement. Nevertheless, we are guided by what the *Rashawn H.* Court said in addressing the responsibility of the local department of social services in the context of a TPR case:

> *[P]overty, of itself, can never justify the termination of parental rights.* The fundamental right of parents to raise their children is in no way dependent on their affluence and therefore is not diminished by their lack thereof. *Nor will homelessness, alone,* or physical, mental, or emotional disability, alone, *justify such termination....*
>
> *[T]he State [may not] leave parents in need adrift and then take away their children. The court is required to consider the timeliness, nature, and extent of the services offered by DSS or other support agencies, the social service agreements between DSS and the parents, the extent to which both parties have fulfilled their obligations under those agreements, and whether additional services would be likely to bring about a sufficient and lasting parental adjustment that would allow the child to be returned to the parent.* **Implicit in that requirement is that a reasonable level of those services, designed to address both the root causes and the effect of the problem, must be offered— educational services, vocational training, assistance in finding suitable housing and employment,** teaching basic parental and daily living skills, therapy to deal with illnesses, disorders, addictions, and other disabilities suffered by the parent or the child, counseling designed to restore or strengthen bonding between parent and child, as relevant. Indeed, the requirement is more than implicit. **FL § 5–525(d), dealing with foster care and out-of-home placement, explicitly requires DSS to make "reasonable efforts"** to "preserve and reunify families" and "to make it possible for a child to safely return to the child's home."

There are some limits, however, to what the State is required to do. *The State is not obliged to find employment for the parent, to find and pay for permanent and*

*suitable housing* for the family, to bring the parent out of poverty, or to cure or ameliorate any disability that prevents the parent from being able to care for the child. *It must provide reasonable assistance in helping the parent to achieve those goals,* but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care.

The State is not required to allow children to live permanently on the streets or in temporary shelters, to fend for themselves, to go regularly without proper nourishment, or to grow up in permanent chaos and instability, bouncing from one foster home to another until they reach eighteen and are pushed onto the streets as adults, because their parents, even with reasonable assistance from DSS, continue to exhibit an inability or unwillingness to provide minimally acceptable shelter, sustenance, and support for them. Based upon evidence of the effect that such circumstances have on the child, a court could reasonably find that the child's safety and health ... is jeopardized. Recognizing that children have a right to reasonable stability in their lives and that permanent foster care is generally not a preferred option, the law requires, with exceptions not applicable here, that DSS file a TPR petition if "the child has been in an out-of-home placement for 15 of the most recent 22 months." *See* FL § 5–525.1(b).

*Id.* at 499–501, 937 A.2d 177 (italics and boldface added).

In the case *sub judice,* the circuit court cited 42 U.S.C. § 675(5), the federal progenitor of F.L. § 5–525.1(b), the provision cited in *Rashawn H.* The court below said:

Certainly, more could have been done to help Respondent's father get a job, which would in turn have helped with getting housing. However, given the length of time Respondent has been removed from the home, Master Sampson's statement that the changing of the plan is "both practicable and realistic" is a sound conclusion. Respondent has been out of the home for 22 months, *see* 42 U.S.C. 675(5)(F).

 As the text above indicates, while the circuit court acknowledged that "more could have been done to help" appellant find a job, it was concerned, understandably, by the length of time that James had been out of the home; it found reasonable efforts largely because of that concern.[23] But, the length of James's out-of-home placement did not automatically compel a finding of reasonable efforts. We agree with appellant that the court was clearly erroneous in finding that DSS made reasonable efforts toward reunification. We explain.

The court cited 42 U.S.C. 675(5)(F) after noting that James had been out of the home for more than 22 months. Section 675(5)(F), a provision of ASFA, establishes a method to calculate the date on which a child is considered to have "entered foster care" for purposes of the federal Title IV–E foster care maintenance payments grant program. It does not refer to "22 months." We assume that, in commenting on the length of James's out-of-home placement, the court meant to refer to a related provision, 42 U.S.C. § 675(5)(E). That provision imposes the following requirement on state child welfare agencies as a condition of federal funding through the Title IV–E program:

> [I]n the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months ... the State shall file a petition to terminate the parental rights of the child's parents ... and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless—
>
> (i) *at the option of the State, the child is being cared for by a relative;*
>
> (ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or

---

**23.** As Bean observes, 36 Tol. L.Rev. at 332, ASFA's "focus on 'time-limited' efforts for reunifying families [ ] and its emphasis on permanency may predispose a judge to find reasonable efforts when failing to do so will delay a permanent ... placement for the child."

(iii) *the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts [to reunify the family] are required to be made with respect to the child . . . .*

(Emphasis added.)

 The federal scheme governing permanency plan review makes clear that relevant judicial determinations "must be made on a case-by-case basis. . . ." 45 C.F.R. § 1356.21(d); *see also* C.J. § 3–816.1(b). The passage of twenty-two months is not, standing alone, a sufficient justification for abridgment of parental rights if, in that period, the Department did not make reasonable efforts to effect reunification. Indeed, the portion of federal law to which the circuit court referred explicitly exempts from the twenty-two month provision in § 675(5)(E) those circumstances in which "the State has not provided to the family of the child . . . such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts [to reunify the family] are required to be made with respect to the child. . . ." 42 U.S.C. § 675(5)(E)(iii); *see also* F.L. § 5–525.1(b)(3)(iii) (even if child has been out-of-home for 15 of the most recent 22 months, local department is not required to file a TPR action if it did not provide services to the family consistent with the case plan). Moreover, the provision cited by the court below is inapposite for another reason: this case falls into an exemption because, "at the option of the State, the child is being cared for by a relative. . . ." 42 U.S.C. § 675(5)(E)(i). *See also* F.L. § 5–525.1(b)(3)(i) (exempting local department from obligation to file TPR petition if the child is in the care of a relative).

 To be sure, both federal and state law make clear that a local department is not required to make "reasonable efforts" indefinitely. Indeed, urgency is a theme that runs throughout the applicable statutes. C.J. § 3–823(h)(3) exhorts: "Every reasonable effort shall be made to effectuate a

permanent placement for the child *within 24 months after the date of initial placement.*" (Emphasis added). *See also* 42 U.S.C. § 629a(a)(7) (establishing Title IV–B federal grant program for "time-limited family reunification services," which are services provided to a child and the parent of a child in foster care to facilitate reunification "safely and appropriately within a timely fashion, but only during the 15–month period that begins on the date that the child . . . entered foster care"); F.L. § 5–525(b)(1) (in accordance with Title IV–B, the Department shall "provide *time-limited* family reunification services to a child placed in an out-of-home placement and to the parents or guardian of the child, in order to facilitate the child's safe and appropriate reunification *within a timely manner*") (emphasis added); COMAR 07.02.11.03(B)(48) (implementing federally-required "time-limited family reunification services" program). But, these statutes and regulations do not provide that the passage of time is a *substitute* for reasonable efforts. To the contrary, while these federal and state provisions limit the time in which the agency is required to make reasonable efforts, they do not license the attenuation of a parent's rights when the agency fails to make reasonable efforts during the applicable time period.

The question remains whether the circuit court erred in finding that DSS made reasonable efforts with respect to reunification. Appellant points out that "the sole impediment to reunification was Appellant's lack of a stable job," which, in turn, affected his ability to secure suitable housing; DSS had no concern for James's safety with appellant. Mr. G. suggests that his poor education and his criminal record were "clear obstacles" to his ability to obtain employment. For that reason, argues appellant, he "required special training or knowledge" from a social worker "to overcome" the challenges he faced. Noting that there was "[a]bsolutely no evidence . . . that Appellant made himself hard to find or was unavailable to the Department," he complains that his referral to People Encouraging People was "the only referral provided by the Department to assist Appellant in obtaining a job."

In its determination that the Department made reasonable efforts, the court stated:

Baltimore City Department of Social Services made the following reasonable efforts with the parent/guardian in support of this plan: entered into a service agreement, referred Respondent for therapeutic services and placement in the home of a relative thereby strengthening family ties, monitored Respondent's father's employment and monitored the respondent's education.

Although the Department's effort regarding therapeutic and educational services for James was commendable, the Department has not suggested how such efforts were designed to assist Mr. G. with his needs. Notably, the only "reasonable effort" in the list above that pertained to appellant is that the Department "monitored" his employment and "entered into a service agreement." Yet, the service agreement was not included in the record. At the hearing before the master, both appellant and Ms. Ukadike testified as to the requirements that the service agreement placed on appellant, which included obtaining employment and housing, as well as maintaining contact with James and with the agency. No evidence was presented, however, as to the Department's obligations under the agreement. Thus, the court could not evaluate what services the Department had committed to provide Mr. G. And, whatever "reasonable efforts" entail, under the circumstances attendant here it should have been more than mere "monitor[ing] [of the] Respondent's father's employment," or a single referral to one employment program.

It is undisputed that appellant attempted on his own, without success, to secure employment. Given his lack of education, his lack of skills, and his prior criminal record, it is not surprising that his efforts to gain employment were not fruitful. Mr. G. clearly was in need of vigorous professional assistance. Although DSS seeks to place the blame on appellant, claiming he "declin[ed] to inform the Department about his lack of employment success after it referred him to People Encouraging People," that assertion is belied by the Department's own witness, Ms. Ukadike, who testified that, following

that lone referral, appellant "call[ed] back and said that he did go [and] that they say they couldn't help him."

The Department's assertion that appellant did not contact DSS to receive a referral until December 2006 is similarly without support in the testimonial record. Neither Ukadike nor appellant stated the date of the referral, other than that it took place sometime between July and December of 2006. Nor is it clear that the single referral was even suited to appellant's circumstance; appellant's uncontradicted testimony was that People Encouraging People informed him that their services were geared to assist HIV-positive persons, and that they did not have a program for him.

To be sure, appellant admitted that he did not ask for another referral, nor did he physically return to the Department's office. But, the record is devoid of any evidence that, after appellant reported that the initial referral was unsuccessful, DSS made any follow up, even to verify that the referral was appropriate, or took any other affirmative step to provide appellant with further assistance in obtaining employment.[24]

No party has cited any Maryland cases that are analogous to the case *sub judice.* We have found few reported Maryland cases in which relatively meager efforts were sustained in the face of a parental challenge.

In the TPR case of *Ivan M., supra,* 335 Md. 99, 642 A.2d 201, the Court reversed a court's finding that a local department failed to make reasonable efforts at reunification. That case is distinguishable from the case *sub judice,* however.

There, the mother had "chronic schizophrenic and autistic mental disorders ... which repeated attempts at psychiatric treatment ha[d] been unable to cure." *Id.* at 119, 642 A.2d

---

**24.** Although DSS faults appellant for failing to ask for more help, we observe that many of the clients who require help do not recognize that they need assistance; they are not proactive. To the contrary, many are intimidated by "the system," lack good communication skills, and are unaware of how to proceed to help themselves. To state the obvious, that is why they need the agency's expertise and assistance.

201. Her condition precluded her from ever holding employment. *Id.* at 118, 642 A.2d 201. The agency repeatedly offered services to the mother, but the mother consistently rejected the assistance. *Id.* at 108–110, 642 A.2d 201. Furthermore, the *Ivan M.* Court explained that, even if the department had failed to offer services, where "attempts at reunification would obviously be futile, the Department need not go through the motions in offering services doomed to failure." *Id.* at 117, 642 A.2d 201. In its view, the evidence "overwhelmingly demonstrate[d] that [the mother] is unfit to care for Ivan and that she will remain unfit indefinitely." *Id.* at 118, 642 A.2d 201.

In this case, appellant does not suffer from a psychological or developmental disability that impairs his parenting ability. Indeed, there is no suggestion that appellant is an unfit parent. Moreover, in contrast to *Ivan M.*, little was offered to appellant in the way of assistance, and he certainly never rejected any help.

*In re Ashley E., supra,* 158 Md.App. 144, 854 A.2d 893, is also pertinent. That case involved a change in the permanency plan for four children, from reunification to termination of parental rights. On appeal, the mother complained, *inter alia,* that the court erred in changing the permanency plan, because the evidence did not establish that the department had made reasonable efforts to reunify. *Id.* at 146, 854 A.2d 893. We upheld the court's determination that the local department had made reasonable efforts toward reunification.

The four siblings in *Ashley E.* were placed in the care of the local department after one of the children revealed at school that she had been sexually abused at home. *Id.* at 146–50, 854 A.2d 893. In interviews with therapists, the children disclosed frequent instances of sexual abuse at the hands of their mother and her sexual partners. *Id.* All four children had emotional and mental problems that, in the view of a psychologist retained by the department, were "the result of long-term abuse, probably for their entire lives...." *Id.* at 153, 854 A.2d

893. Expert testimony established that the mother lacked the ability to keep the children safe. *Id.* at 156, 854 A.2d 893.

Notably, during the sixteen months that the children had been in foster care, the mother "had not complied with the service agreements (one of which she signed and two of which she did not)." *Id.* at 155, 854 A.2d 893. The court recounted the mother's derelictions, *id.* at 155–56, 854 A.2d 893:

[The mother] had not participated in parenting classes that had been offered. She had not consistently signed releases for medical treatment for the children. She had not consistently attended visitation with the children. Out of 68 weeks of visitation, she had seen Gregory 26 weeks, Matthew 14 weeks, Laione 21 weeks, and Ashley 18 weeks. She had not attended school meetings for the children. She had lost several jobs since September 2002.

[The social worker] further explained that the appellant refused to acknowledge the abuse the children had experienced in her household, and therefore refused to take responsibility for it. Her lack of honesty in acknowledging the circumstances in which the children were sexually abused and consequent lack of empathy for them made it difficult for the children to heal emotionally from their trauma.

In the face of such derelictions, we upheld the change in the plan, citing the department's repeated attempts to maintain visitation by the mother and its provision of psychological evaluation and counseling services to the children and the mother, as well as referrals to other services, such as parenting classes, of which the mother did not avail herself. *Id.* at 165–66, 854 A.2d 893. We were satisfied that the psychological evaluations of the mother "showed that [she] does not have a mental or developmental disability that would make her not amenable to the general, ordinary type of reunification services that in fact were offered to her." *Id.* at 167, 854 A.2d 893.

The facts of *Ashley E.* are markedly different from those in the case *sub judice.* As appellant notes, "[t]his is not a case of a parent who has abused his child or is drug addicted."

In a handful of other cases, Maryland appellate courts have held that a local department failed to make reasonable efforts toward reunification. The TPR case of *In re Adoption/Guardianship Nos. J9610436 and J9711031,* 368 Md. 666, 796 A.2d 778 (2002) *("Tristynn D. and Edward F."),* is noteworthy, because the Court recognized the need for the agency to provide appropriate services, albeit in the context of a father who was cognitively impaired. There, the father was unable to read, and was alleged by the local department to be "mentally disabled." *Id.* at 699 n. 22, 796 A.2d 778. But, the Court observed that there was insufficient evidence, beyond "conjecture and speculation," that he was " 'mentally disabled' as that term is scientifically measured." *Id.* Although the department provided various services, including parenting classes and referrals to a domestic violence program and a drug and alcohol evaluation, *id.* at 684, 796 A.2d 778, the Court noted that the services did not address the deficiencies that, in the department's view, precluded reunification. The Court said, *id.* at 682–84, 796 A.2d 778:

> Insofar as we have been able to discern from the record, [the Department] never offered any specialized services designed to be particularly helpful to a parent with the intellectual and cognitive skill levels [the Department] alleges are possessed by petitioner.... [For example,] the record does not reflect that [the Department] sought to utilized the services that might be available through the Developmental Disabilities Administration, even though it was relying in its drive toward termination on the fact that in the opinion of its workers, petitioner was disabled by reason of mental impairment.

> \* \* \*

> [The Department] apparently did not even offer petitioner services to assist him with literacy, even after petitioner

signed [a] Social Services Agreement and fulfilled the obligations it set forth.

Accordingly, the Court reversed the termination of the father's parental rights as to his two sons. The Court concluded, *id.* at 700–701, 796 A.2d 778:

Primarily, [the Department] failed petitioner, and did not adequately perform its statutorily mandated duties ... by failing to provide a timely and sufficiently extensive array of available programs for petitioner, who, while perhaps hampered by some cognitive limitations, is eager and may well be able, with properly tailored services, to care for his children. From the moment petitioner came to ask for help, [the Department,] as far as we can discern, provided only untailored reunification services. [The Department] should have, instead of providing services for which there was little or no need, provided more specific services for petitioner who consistently displayed a willingness and genuine desire to care for his children. [The Department] had at its disposition better suited services for petitioner.

In *In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853*, 103 Md.App. 1, 651 A.2d 891 (1994) (*"Michael and Melvin J."*), this Court reversed the termination of a father's parental rights as to his twin sons. There, the local department had provided a wide array of services to the children's mother, *id.* at 16, 651 A.2d 891, who was also a juvenile in the department's care, *id.* at 6–7, 651 A.2d 891, but it did not provide any services to the young father. Noting the array of services generally available, *id.* at 18–19, 651 A.2d 891, we stated, *id.* at 21, 651 A.2d 891:

In the present case, [the Department's] efforts at reunification amounted to a single conversation with [the father] and the mailing of several form letters to him. While [the father] was undoubtedly delinquent in his parenting of the twins for the first two and one-half years of their lives, the evidence at trial did not establish that [the Department's] attempts at offering services would be futile, nor did the evidence demonstrate that no amount of reunification ser-

vices would even accomplish reunification of [the father] with his children.

*In re Tiffany B.*, 228 S.W.3d 148 (Tenn.Ct.App.2007), cited by appellant, also provides guidance. In that case, the appellate court interpreted Tennessee's enactment of the "reasonable efforts" requirement of ASFA. The court stated, 228 S.W.3d at 158 (internal citations and footnote omitted):

> While the Department's efforts to assist parents need not be "herculean," the Department must do more than simply provide the parents with a list of service providers and then leave the parents to obtain services on their own. The Department's employees must bring their education and training to bear to assist the parents in a reasonable way to address the conditions that required removing their children from their custody and to complete the tasks imposed on them in the permanency plan.

The *Tiffany B.* court observed that the local department had made scant efforts to work with the parents. *See id.* at 159–60. It concluded: "Despite its knowledge that the parents were addicted to crack cocaine, homeless, unemployed, and facing criminal charges, the Department apparently expected the parents to initiate the remedial efforts on their own and to ask their case manager for help. This expectation was unreasonable." *Id.* at 160.

We have found several cases from courts of other states that have grappled with similar factual circumstances under their own state law implementations of the reasonable efforts requirement. These cases suggest that one referral by the department, without followup, such as happened here, does not constitute reasonable efforts. As the Minnesota Court of Appeals stated in *Matter of Welfare of J.A.*, 377 N.W.2d 69, 73 (Minn.Ct.App.1985): "To measure the adequacy of services, it is necessary to learn whether the services go beyond mere matters of form, such as the scheduling of appointments, so as to include real, genuine help. . . ." *See also State ex rel. A.T.*, 936 So.2d 79, 86 (La.2006) (reversing termination of parental rights, noting that the social services department "admits that

no rehabilitative services were offered to [the mother] to assist her in obtaining suitable housing after the children were taken into custody . . . yet this was the main, if not sole, impediment to reunification cited continuously by [the department].”); In *In re Manuel P.*, 889 A.2d 192, 196 (R.I.2006) (upholding a lower court's finding that the agency did not make reasonable efforts toward reunification; although the department had provided the mother with psychological evaluations and parent education classes, it failed to follow up in providing the services that were indicated by the evaluations.)

*In re Alvin R.*, 108 Cal.App.4th 962, 134 Cal.Rptr.2d 210 (2003), is particularly instructive. In that case, a child had been removed from his father's custody and placed in the care of his grandmother because of the father's excessive physical discipline of the child. *Id.* at 213–15. The agency was supposed to arrange therapeutic counseling for the child, as a predicate for visitation with the father with the goal of reunification. Instead, the agency made a single referral to a counselor who was not able to accept new patients.

The California appellate court reversed a finding that reasonable reunification efforts had been made, explaining, *id.* at 218 (emphasis in original; internal citations omitted):

> Reunification services need not be perfect. But they should be tailored to the specific needs of the particular family. Services will be found reasonable if the Department “has identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . .
>
> The maternal grandmother's schedule and her insistence upon a therapist near her home was a major obstacle to any reunification efforts. Nevertheless, the Department's only effort to overcome this obstacle was apparently to make a referral to a therapist who had no time available to see [the child]. There was no effort to find other therapists in the

area, or that the Department attempted to find transportation for [the child] to see an available therapist further away. *Some* effort must be made to overcome obstacles to the provision of reunification services.

We recognize that the mere fact that more services could have been provided does not render the Department's efforts unreasonable. Here, however, reunification was not going to be accomplished without visitation, and the social worker knew that [the child] would be unlikely ever to consent to visitation without conjoint therapy. And conjoint therapy was not going to be accomplished unless some effort were made to get [the child] into individual therapy. . . .

[T]hus, *one* service, getting [the child] into eight sessions of individual therapy, stood in the way of all measures remaining under the reunification plan, and the Department submitted no evidence of having made a good faith effort to bring those sessions about. . . . And there was no evidence with regard to any follow-up by the Department to move things along or to assist the overwhelmed maternal grandmother in any respect other than a referral to a therapist with a waiting list.

And yet, time was *critical* . . . . Under such circumstances, we cannot find that substantial evidence supports the finding that reunification services were reasonable.

In this case, Ms. Ukadike testified that the only impediments to appellant regaining custody of James were appellant's lack of stable employment and lack of housing, but the Department claimed it could not provide housing assistance until appellant was employed. And yet, the only effort the Department made to address appellant's unemployment was a single referral to an organization that could not address appellant's employment needs.

The case of *In re Ebony H.*, 68 Conn.App. 342, 789 A.2d 1158 (2002), stands in contrast to the instant case. There, the mother, an abuser of cocaine, was referred to several substance abuse programs, as well as counseling sessions, for

which she failed to keep appointments. *Id.* at 1161. Eventually, the mother completed a forty-five day inpatient substance abuse program, and then asked the department to assist her in obtaining housing. "In response, the department 'did nothing more than make one telephone call to Community Action with no follow up.'" *Id.* Nine days later, the mother again tested positive for cocaine, and missed several subsequent appointments for enrollment into other substance abuse programs. *Id.* at 1161–62. Although the trial court castigated the department for its response to the mother's request for housing assistance, calling it "'shameful and far beneath any acceptable level of professional conduct,'" *id.* at 1162 (quoting trial court), the trial court ultimately concluded that the department had made reasonable efforts toward reunification, given the multiple referrals for substance abuse treatment, and that "'[c]ocaine addiction and a failure to follow through on counseling are the factors that prohibit reunification.....'" *Id.* (quoting trial court). The appellate court affirmed, stating, *id.* at 1163:

> Notwithstanding the court's finding that the department's response to the [mother's] request for assistance in obtaining housing was shameful and unacceptable, our review of the evidence ... does not leave us with a definite and firm conviction that the court mistakenly found that the department had made reasonable efforts.... The evidence overwhelmingly supports the court's findings that the department, on numerous occasions, had enrolled the [mother] in treatment programs ... and that [her] addiction ... thwarted the department's efforts to reunify her and the child.

Reasonable efforts were found in *Ebony H.*, despite the department's "shameful and unacceptable" single referral for housing, because the impediment to reunification was not the parent's lack of housing. Rather, it was her substance abuse, which the department had made copious efforts to address. In this case, the Department responded to the major impediment to reunification, appellant's lack of employment, in pre-

cisely the way that the *Ebony H.* court characterized as "shameful and unacceptable."

We conclude that the juvenile court erred in finding that the Department made reasonable efforts toward reunification. Although the Department's efforts need not be perfect to be reasonable, and it certainly need not expend futile efforts on plainly recalcitrant parents, its services must adequately pertain to the impediments to reunification. Moreover, the obligation to render "reasonable efforts" rests on the Department, not the parent, and, in the context of this case, it required more than a single referral to a vocational resource. Appellant's lack of a job, which, in turn, adversely affected his ability to obtain suitable housing, prevented his reunification with James. In effect, "for want of a nail ... the battle was lost." [25]

## III.

In light of our conclusion that the court erred in finding that the Department made reasonable efforts, we turn to the ultimate determination of whether the court abused its discretion in changing James's permanency plan.

*In re Yve S., supra,* 373 Md. 551, 819 A.2d 1030, is relevant to our analysis. There, the juvenile court changed the permanency plan for a twelve-year-old from the goal of reunification to long-term foster care. *Id.* at 558, 819 A.2d 1030. The plan was later changed to termination of parental rights and adoption. Thereafter, it was again changed to long-term foster care. *Id.* at 559, 819 A.2d 1030. The mother noted appeals as to the various rulings, which were consolidated. *Id.* at 560, 819 A.2d 1030. The Court observed, *id.* at 565, 819 A.2d 1030:

---

25. "For want of a nail, the shoe was lost.
 For want of a shoe, the horse was lost.
 For want of a horse, the rider was lost.
 For want of a rider, the battle was lost.
 For want of a battle, the kingdom was lost.
 And all for the want of a horseshoe nail."
 —Traditional proverb, first appearing in print in North America in *Poor Richard's Almanack* (1752).

The proper starting point for legal analysis when the State involves itself in family relations is the fundamental constitutional rights of a parent. Certain fundamental rights are protected under the U.S. Constitution, and among those rights are a parent's Fourteenth Amendment [] liberty interest in raising his or her children as he or she sees fit, without undue interference by the State.

Nevertheless, the Court acknowledged, *id.* at 568, 819 A.2d 1030: "The rights of a parent in the raising of his or her children ... are not absolute. One need not wander far into the thickets of family law before running into situations and circumstances where application of an absolute right of the parent would fail to produce a just result." *See also In re Mark M.,* 365 Md. 687, 705–06, 782 A.2d 332 (2001).

The Court discussed the manner in which the best interest of the child standard is to be applied when considering a change in permanency plan, 373 Md. at 618, 819 A.2d 1030:

[T]he standard does not mean that the child should be placed in the best possible environment. The statutory mandate requires that reunification of the child with the parent be the goal of the permanency plan if there is competent and credible evidence that future abuse or neglect is not likely. "The fear of harm to the child or to society must be a real one predicated upon hard evidence; it may not be simply a gut reaction or even a decision to err-if-at-all on the side of caution." *In re Jertrude O.,* 56 Md.App. 83, 100 [466 A.2d 885] (2003[1983] ).

Turning to the lower court's decision, the *Yve S.* Court concluded that it had abused its discretion in applying the standard. The Court reasoned, *id.* at 618–19, 819 A.2d 1030:

A fair reading of the findings and ruling of the hearing court indicate that the focus of the court was on what would be the best environment for Yve S., not whether future neglect or abuse was not likely if returned to her mother's custody. The trial judge commented on the allegedly superior stability and structure of the foster home, and whether Yvonne S. would be able to provide the level of structure the

court felt Yve S. needed. Reinforcing this notion, the court ruled that Yve S. should remain in long-term foster care, stating "I feel that it's appropriate that she remain, where she has been, for over thirty-some months, where she has done very well. She's blossomed there." Because the hearing judge focused on where Yve S. would be better off, as opposed to the competent evidence of future abuse or neglect, insufficient consideration was given to whether the goal of the permanency plan should be reunification rather than long-term or permanent foster care.

In this case, as we have seen, in changing James's permanency plan from parental reunification to placement with a relative, the court wrote: "[G]iven the length of time Respondent has been removed from the home, [the master's] statement that the changing of the plan is 'both practicable and realistic' is a sound conclusion. Respondent has been out of the home for 22 months, *see* 42 U.S.C. 675(5)(F)."

In our view, the juvenile court's decision partakes of a similar error to that identified by the *Yve S.* Court. In focusing on what was "practicable and realistic," the court never addressed James's best interest, as required by statute and case law. *See* C.J. § 3–823(h)(2)(vi) (court shall change permanency plan "if a change in the permanency plan would be in the child's best interest"); *In re Damon M., supra,* 362 Md. at 436, 765 A.2d 624 (permanency plan, once established, may not be changed unless the court determines "it is in the child's best interest to do so"). Moreover, it seems to have overlooked the statutory factors in F.L. § 5–525(e)(1), discussed earlier.

To be sure, both F.L. § 5–525(e)(1)(iv) and (e)(1)(vi) speak to the amount of time that the child has been in the custody of the State. It is also clear that ASFA, and by extension the conforming provisions of Maryland's statutes, recognize that, in the words of the *Rashawn H.* Court, it is detrimental for children to remain in foster care when, "even with reasonable assistance from DSS," the parents are unable or unwilling "to provide minimally acceptable shelter, sustenance, and support

for them." *Rashawn H., supra,* 402 Md. at 501, 937 A.2d 177. But, the duration of James's stay in the care of his cousin seemed to be the circuit court's paramount consideration.[26]

Notably, DSS was not seriously concerned that appellant posed any danger to James of abuse or chronic neglect. Upon the record before us, James was taken into the Department's care because of Mr. G.'s temporary inability to care for him due to his brief incarceration. Moreover, there was no evidence that James would be harmed if he were returned to his father. To the contrary, Ms. Ukadike, the State's only witness, stated: "I do know that the child is attached to his parents especially his father."

James contends that, even if the Department did not make reasonable efforts, we should not disturb the court's change in the permanency plan. In his view, the court's Order that the Department "must make more aggressive efforts to help [appellant] obtain employment," coupled with its contempt power to enforce that order, is a sufficient assurance that the Department will provide appellant with adequate services going forward. He suggests that the court's Order "has actually provided James with more possibilities for permanency," because "the Department must now seek a relative placement while continuing to assist the father to overcome the barrier that has prevented reunification."

According to James, either he or appellant may enforce the court's Order via contempt proceedings against the Department. But, James has not considered that appellant would be unable to challenge a ruling that does not find the Department in contempt. *See Pack Shack, Inc. v. Howard County,* 371 Md. 243, 246, 808 A.2d 795 (2002) (holding that "a party that files a petition for constructive civil contempt does not have a right to appeal the trial court's denial of that petition").

At oral argument, appellant noted that this Court's affirmance of the lower court's Order would arguably foreclose

---

**26.** As noted previously, the 22–month provision does not control the case at bar.

appellant's ability to appeal a later order of the court maintaining a permanency plan of guardianship with a relative. Therefore, appellant urged that he cannot wait to see if the Department's efforts improve; if those efforts are not satisfactory to Mr. G., he likely would be unable to appeal another adverse decision that has the effect of maintaining what would by then have become the status quo. We agree.

Under the Court of Appeals's recent jurisprudence on the reviewability of permanency plan orders, a subsequent ruling that maintains the revised permanency plan is not necessarily appealable. A party may only appeal a non-final order arising from the permanency plan review process if it "operates to either deprive [the parent] of the care and custody of her children or change the terms of her care and custody of the children to her detriment." *In re Billy W., supra,* 386 Md. at 691–92, 874 A.2d 423. The *Billy W.* Court ruled that an order that merely "maintained the permanency plans for the children" was not appealable, because the parent's "custodial rights had been abrogated when the children were declared in need of assistance and committed to DSS's custody, but not when the trial court maintained the permanency plans for the children, which did not adversely affect [the parent's] parental rights." *Id.* at 693, 874 A.2d 423.

In *In re Alvin R., supra,* 108 Cal.App.4th 962, 134 Cal. Rptr.2d 210, the court noted: "When it appears at the six-month review hearing that a parent has not been afforded reasonable reunification services, the remedy is to extend the reunification period, and order continued services." *Id.* at 218–19. We agree with the *Alvin R.* court. On this record, given DSS's failure to provide reasonable efforts, the court erred or abused its discretion in changing the permanency plan from reunification to relative placement.[27]

---

**27.** As the *Alvin R.* court made clear, "[t]he remedy is not to return the child to the parent...." *Alvin R.,* 134 Cal.Rptr.2d at 220. However, appellant does not contend that he is presently able to care for James, and has not requested immediate reunification as a remedy.

For these reasons, we shall reverse the Order of the circuit court changing the permanency plan and remand for further proceedings.[28]

**ORDER CHANGING PERMANENCY PLAN RE-VERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PRO-CEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

**28.** We note that maintenance of a permanency plan of parental reunifi-cation may be combined with court-ordered contingency planning for placement with a relative. In *In re Karl H., supra*, 394 Md. at 422, 906 A.2d 898, the Court observed that the statutory scheme "clearly allows for such contingency planning." *See also* 42 U.SC. § 671(a)(15)(F) ("[R]easonable efforts to place a child . . . with a legal guardian . . . may be made concurrently" with reasonable efforts to reunify the family.); F.L. § 5–525(d)(3) (same); 45 C.F.R § 1356.21(b)(4) ("Rea-sonable efforts to finalize an alternate permanency plan may be made concurrently with reasonable efforts to reunify the child and family."). A contingency-planning approach would enable the Department to direct resources toward preparing James's cousin to become his legal guardian in the event that appellant is ultimately unable to regain custody, while preserving appellant's ability to enforce DSS's compli-ance with the "reasonable efforts" mandate.

Nevertheless, we point out that the *Karl H.* Court disfavored so-called "concurrent permanency plans" of both reunification and adoption, 394 Md. at 422, 906 A.2d 898, "especially when the inconsistent plan calls for a TPR petition to be filed before the next scheduled court review of the permanency plan," on the ground that such "diametrical-ly inconsistent" plans "give DSS (and the parents) no real guidance and can lead to arbitrary decision-making on the p art of DSS." *Id.* The Court opined that "[t]he objective of contingency planning can be achieved without a Janus-type order." *Id. See also Rashawn H.*, 402 Md. at 488 n. 5, 937 A.2d 177.