IN THE COURT OF APPEALS OF THE STATE OF IDAHO

Docket No. 37138

| | | |
|---|---|---|
| IN THE MATTER OF JANE DOE, A MINOR CHLD. | ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) ) | 2010 Opinion No. 21 |
| Plaintiff-Respondent, | ) ) | Filed: March 30, 2010 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JANE DOE I, | ) ) | SUBSTITUTE OPINION THE COURT'S PRIOR OPINION |
| Respondent. | ) ) ) | DATED MARCH 26, 2010 IS HEREBY WITHDRAWN |
| | ) | |

Appeal from the Magistrate Division of the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Robert Caldwell, Magistrate.

Order terminating parental rights, affirmed.

John M. Adams, Kootenai County Public Defender; Sarah L. Sears, Deputy County Public Defender, Coeur d'Alene, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Denise L. Rosen, Deputy Attorney General, Boise, for respondent.

_____

MELANSON, Judge

Jane Doe I appeals from the magistrate's order terminating her parental rights to her daughter J.D. For the reasons set forth below, we affirm.

I.

FACTS AND PROCEDURE

Doe has a history of substance abuse dating back several years and resulting in numerous periods of incarceration. A petition to remove J.D. from Doe's custody was filed on the basis that Doe twice tested positive for amphetamines during her pregnancy with J.D., neglected J.D.'s medical needs by failing to follow through with pediatric appointments, was homeless and living out of her car, and was arrested for possession of methamphetamine with the intent to deliver when J.D. was seven weeks old. The magistrate granted temporary legal custody to the Idaho

1

Department of Health and Welfare on the basis of an unstable home environment. A case plan was subsequently approved by the court which set forth reasonable efforts for reunification or, alternatively, the termination of parental rights. Among other things, the case plan required Doe to complete inpatient treatment, participate in random drug testing, refrain from associating with drug users and places of drug use, attend community-based recovery groups, obtain a mental health assessment and comply with its recommendations, complete a parenting class for infants and toddlers, adhere to the requirements of all court orders, and acquire stable housing and employment.

Doe continued to use methamphetamine after the case plan was ordered. On one occasion, Doe arrived at the department offices while under the influence of methamphetamine for what she believed was a visit with J.D. Twice Doe became pregnant by known drug users. One pregnancy resulted in a miscarriage, and the second pregnancy resulted in the birth of a son. Doe did not obtain employment and had not held a job for several years. She lived with a friend without paying rent. She was also frequently late to visitation appointments with J.D. or missed them altogether.

At a review hearing, the magistrate approved a permanency plan for termination of parental rights without the need for further reunification efforts including visitation. Subsequently, the department filed a petition to terminate Doe's parental rights.[1] A two-day trial was held on the department's petition. After the trial, the magistrate entered an order terminating Doe's parental rights. The magistrate held: (1) Doe had neglected J.D. as defined by I.C. § 16-1602(25)[2]; (2) Doe had neglected J.D. for failing to comply with the case plan and reunification had not occurred within the prescribed time standard; and (3) Doe was unable to discharge parental responsibilities for a prolonged period which was injurious to the health, morals, or well-being of J.D. Doe appeals.

## II.

---

[1]     J.D.'s father, who was not living with Doe, consented to the termination of his parental rights.

[2]     Idaho Code Section 16-1602(25)(a) provides, in pertinent part, that a child is "neglected" when the child "is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them."

## STANDARD OF REVIEW

In an action to terminate parental rights, due process requires this Court to determine if the magistrate's decision was supported by substantial and competent evidence. *State v. Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006). Substantial and competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.,* 143 Idaho at 345-46, 144 P.3d at 599-600 This Court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Doe v. Doe*, 148 Idaho 243, 246-47, 220 P.3d 1062, 1064-65 (2009). We conduct an independent review of the record that was before the magistrate. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## ANALYSIS

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). *See also Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). "Implicit in [the Termination of Parent and Child Relationship Act] is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2). Therefore, the requisites of due process must be met when the department intervenes to terminate the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the department prove grounds for terminating a parent-child relationship by clear and convincing evidence. *Id*. Idaho Code Section 16-2005 permits the department to petition the court for termination of the parent-child relationship when it is in the child's best interest and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period which will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

In this case, the magistrate concluded, among other things, that Doe had neglected J.D. for failing to comply with the case plan and that reunification between J.D. and Doe had not occurred. Idaho Code Section 16-2002(3) defines "neglect" as any conduct included in I.C. §

3

16-1602(25), as well situations where the "parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9)." The time standard established by I.C. § 16-1629(9) is defined as when "a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care."

In support of its conclusion that Doe had neglected J.D., the magistrate found that Doe failed to appear for numerous drug tests as required by her case plan and tested positive on several other occasions. Doe continued to associate with known drug users and failed to complete substance abuse treatment. Furthermore, Doe failed to complete a mental health assessment and a parenting class until after the magistrate had approved a permanency plan which included termination of parental rights. She also failed to obtain a stable source of income and adequate housing. Finally, the magistrate found that the department had made reasonable efforts to reunite Doe and J.D., but that the child had failed to bond with her mother. J.D. had been in foster care for over twenty months and had bonded with her foster parents.

During the two-day trial on the state's motion to terminate Doe's parental rights, fifteen witnesses testified. We need not look much further than Doe's own testimony to find substantial and competent evidence supporting the magistrate's conclusions. First, concerning her employment history and living arrangements, Doe testified:

> [STATE]: Okay. And let's -- let us go back to employment. Can you tell us, in the last five years, beginning five years back, which would be 2002, give us your list of actual paid employment above the table, where you've received W-2's and checks?
>
> [DOE]: I'd have to say um, probably about five years ago . . . is the last time I was employed.
>
> [STATE]: And you have not had outside paid aboveboard employment since that time?
>
> [DOE]: No.
>
> [STATE]: So, you're living now -- you gave us the address . . . . Who owns that residence?
>
> [DOE]: [R.J.].
>
> [STATE]: Okay. And how do you know [R.J.]?
>
> [DOE]: He's a family friend. I consider him an uncle or -- he's like an uncle or a father to me. He's um, been in my life since I was a baby. And he has helped uh, raise me my entire life.
>
> . . . .
>
> [STATE]: Do you pay rent?

4

```
[DOE]:      No, I don't.
[STATE]:    Do you pay utilities?
[DOE]:      No, no, I don't.  Not at this time.
[STATE]:    Do you buy or contribute to the food source.
[DOE]:      I do.
[STATE]:    How do you do that?
[DOE]:      Food stamps.
```

Later, Doe testified concerning her ongoing relationships with known drug users:

```
[STATE]:    And during the period of time, March, 2008 to February,
2009, you became pregnant, again?
[DOE]:      Yes.
. . . .
[STATE]:    And who was the father?
[DOE]:      [J.B.].
. . . .
[STATE]:    So, you were, obviously, spending time with [J.B.] at that
time?
[DOE]:      Yes, I was.
. . . .
[STATE]:    So, he was, also, a user of methamphetamine.
[DOE]:      Yes.
[STATE]:    And during that period of time that you were pregnant in
June, you were actively using; correct?
[DOE]:      Yes, I was.
. . . .
[STATE]:    Okay.  And did you miscarry in the month of June --
[DOE]:      Yes, I did.
[STATE]:    -- 2008?  And after June of 2008, you became pregnant,
again?
[DOE]:      November um, is when I became pregnant, again.
[STATE]:    And who is the father of that child?
[DOE]:      [L.B.].
[STATE]:    And [L.B.], also, has a criminal history; correct?
. . . .
[DOE]:      For methamphetamine.
[STATE]:    Okay.  And at the time you became pregnant with [L.B.]'s
child, was he actively using?
[DOE]:      Yes, he was.
[STATE]:    And you were, as well?
[DOE]:      Yes, I was.
```

Doe then testified about her guilty plea to criminal charges and her placement in the drug court program.  She testified that she used methamphetamine on the day of her sentencing which

5

resulted in a positive drug test at the start of her drug court programming. Additionally, Doe admitted to additional sanctions arising out of her participation in the drug court program. Doe then testified concerning her visitations with her daughter and why they were decreased from two visits a week to one visit a week:

> [DOE]: As far as I know it was because I missed one visit.
> [STATE]: Okay. And because you were testing positive and not [complying with urinalysis drug tests]; correct?
> [DOE]: Yeah, because I was not [complying with urinalysis drug tests]. I did not go in uh, do any [urinalysis tests].
> [STATE]: But you -- and you had agreed to a case plan, to work a case plan; is that correct?
> [DOE]: That's correct.

Doe continued by admitting to using methamphetamine during the period of time when she was allowed visitations with her daughter. She also testified that she was discharged from an outpatient program for nonattendance. Additionally, Doe testified that she did not finish any parenting class before the department had filed for termination of her parental rights.

Additional witnesses offered testimony concerning Doe's repeated failures to comply with the requirements of the case plan. Several witnesses confirmed Doe's lack of completion of the required parenting course and mental health evaluation as well as her repeated drug use and association with known drug users. A representative from the drug testing lab testified that Doe was called upon for urinalysis testing on sixty-eight occasions, to which she participated in only twelve. Of the twelve Doe participated in, six were positive for controlled substances.

Concerning Doe's reunification with J.D., a caseworker testified to the observable signs of bonding between J.D. and her foster parents while demonstrating discomfort and apathy toward Doe:

> [STATE]: What were the signs that you saw that would have you draw [the conclusion that there was significant bonding between J.D. and her foster mother and not Doe]?
> [WITNESS]: Well, the observable signs were the baby um, crying or screaming until the foster mother would -- would come into the room. Over time that crying and screaming gradually subsided. My impression was that -- that subsided, but then uh, she would clear -- she would look to the foster mother toward the end of the mother's visitation um, with her arms out and uh, look for hugs. And she would -- if she had been crying, she would settle down. Over time she -- there was less crying. And I -- I assumed that, that was due in large

6

measure to the socialization process that I'd observed between the foster mother and -- and the -- with [J.D.]

They took the baby to church, right -- they're regular church goers. She was involved with other families and people. They extended their own extended family, the foster parents uh, would -- were over for several holiday dinners at the foster parents' home, and she just -- the baby seemed to be more comfortable around other people as that process went on. She had been with the foster parents um, for a longer period of time. But she was always -- she would always look for -- to um, the foster mother coming back to pick her up um, at the end of the visits with the natural mother.

[STATE]: How did that contrast with what you saw when the -- did you observe the visits between the natural mother [Doe] and the child without the foster mother present?

[WITNESS]: Yes.

. . . .

[STATE]: Okay. And what did you -- what were your observations of the visits between [Doe] and [J.D.]?

[WITNESS]: Well, initially there was a lot of . . . screaming and crying. Initially she had difficulty in calming her down. And over a period of, let's say from -- well, just a month or a month and a half as -- as the foster -- after she'd been with the foster mother um, the foster mother would offer advice to her from time-to-time to help her calm [J.D.].

[STATE]: What were your observations -- you said that you saw [J.D.] actively reach for the foster mother at ending visits and that kind of thing. What did you observe when visits would begin and during the visit with regard to that type of behavior with [J.D.] and [Doe]?

[WITNESS]: She wasn't as um -- as comfortable. She didn't appear to be as comfortable with the natural mother as she was with the foster mother. And I -- I draw that comparison, also, on the basis of what I observed in my home visits at the foster home. The baby was very um -- she seemed to be an -- become an integral part of that little family. She had, also, a uh -- an infant foster brother and an older toddler brother. She got along very well with them. A lot of smiling and laughing and uh -- and play.

She -- when the foster father came home at the end of the day, I remember one visit particularly um, you know, when he came through the front door, well, she um, had opened arms for him and smiled. And as time progressed she had -- she had begun to use little simple terms like "dah-dah" and "ma-ma" and clearly she seemed to be a very integral part of that family.

. . . .

[STATE]: And as the CASA representative assigned to this case, do you have an opinion as to the best interest of [J.D.]?

[WITNESS]: My opinion as to [J.D.]'s best interest is that uh -- is that she should continue with the current placement. Hopefully those people would be able to adopt her. I certainly uh, don't like to recommend the loss of a natural parent's rights, but in this case I think [J.D.]'s long-term interests are at extreme risk if she's sent back to her . . . natural mother.

7

These observations and conclusions were corroborated by other witnesses, including another caseworker who testified as follows:

> [STATE]: -- per the plan. And in this case, has [J.D.] been in the care of the Department 15 out of the past 22 months?
> [WITNESS]: Yes, she has.
> [STATE]: And has the reunification efforts the Department has sought to have happen in this case, up until March of 2009, were they successful?
> [WITNESS]: No, they were not.
> [STATE]: Was [Doe] actively participating in the reunification efforts with her daughter?
> [WITNESS]: No, she was not.
> [STATE]: And you made a recommendation for termination of parental rights to the Court. Can you tell us why you believe that he should do that?
> [WITNESS]: My recommendation for um, termination of parental rights was based on [Doe]'s continued drug use and instability. Her lack of stable housing and income to provide the basic needs for her child. The lack of bonding and attachment, as well as [Doe] um, not having a clear understanding of child development and the developmental needs of [J.D.]. So -- and her not reducing the risks that originally brought [J.D.] into care.

Doe's probation officer through the drug court program testified that Doe had a rough start in the drug court program, but that she had been doing very well since that time. Doe also called two friends as witnesses who testified that she had changed and progressed over the course of her treatment in the drug court program. They also testified as to Doe's competency in raising her son. Doe again testified concerning her efforts to bond with her child and remain clean and sober. Indeed, it appears from the record that Doe made changes in her life after the permanency plan for termination of her parental rights was entered in March 10, 2009.

After the trial, the magistrate terminated Doe's parental rights to J.D. The magistrate held that termination was in J.D.'s best interests, Doe did not comply with the case plan, she had not bonded with J.D., and that reunification had not occurred within the statutory timeframe. Concerning Doe's recent progress, the magistrate held:

> The Child's best interest is to be in a secure, safe, and stable home environment without further exposure to the hazards of substance abuse. [Doe] cannot provide this type of environment. She should be given credit for her progress, but it is not in the best interest of her Child to wait for permanency. [Doe] entered drug court in February, 2009 and used methamphetamines on the day she entered her guilty plea in District Court. She has since been sanctioned

more than once in drug court for non-compliance. Since March, 2009, she has greatly improved showing signs of compliance with her drug court requirements. To her credit, she is now involved with treatment again and seems to be doing much better. However, she has a long and stubborn addiction to methamphetamines and she is only very early in her recovery.

Based on the totality of the evidence presented at the trial on the state's petition to terminate parental rights, we conclude that there was substantial and competent evidence to support the magistrate's determination that termination was in the best interests of J.D., that Doe had not complied with various requirements of her case plan, and that reunification had not occurred within the statutory timeframe. There was also substantial and competent evidence that Doe had made some progress, but that a significant period of her sobriety from the time she entered the drug court program until the time of trial was achieved while she was incarcerated or in inpatient treatment. In essence, Doe had nearly a year of showing no improvement followed by five months of moderate success in what will be a long struggle. Accordingly, the magistrate did not err by holding that termination was in J.D.'s best interests, Doe had neglected J.D. by not complying with her case plan, and that reunification had not occurred within the statutory timeframe. Because neglect constitutes a sufficient, independent ground for termination of parental rights, we do not address the magistrate's additional reasons for termination.

Doe also argues that the magistrate erred by holding that the department had made reasonable efforts to reunite Doe and J.D. The testimony presented at trial demonstrated that the department attempted to hold weekly meetings with Doe to help her to comply with her case plan and discuss any issues. Furthermore, Doe was provided with weekly visitation with J.D. which was subsequently increased to twice a week. However, because of Doe's actions, the visits were later decreased to once a week. Doe was advised of appointments and attempts were made to contact Doe to involve her in the process, but she did not respond. By her own testimony, Doe disagreed with much of the department's efforts. However, there is substantial and competent evidence to support the magistrate's conclusion that reasonable efforts were made by the department to reunite Doe and J.D.

## IV.

## CONCLUSION

There is substantial and competent evidence to support the magistrate's conclusion that termination was in J.D.'s best interests. There is also substantial and competent evidence to

support the magistrate's conclusion that Doe had neglected J.D. for failure to comply with her case plan and that reunification had failed to occur within the statutory timeframe. Furthermore, there is substantial and competent evidence to support the magistrate's conclusion that the department had made reasonable efforts to reunite Doe and J.D. Accordingly, the magistrate's order terminating Doe's parental rights to her daughter J.D. is affirmed. No costs or attorney fees are awarded on appeal.

Judge GRATTON, **CONCURS.**

Judge GUTIERREZ, **DISSENTING**

I respectfully dissent from the majority's opinion in its entirety. In my view, the magistrate erred by finding that Doe was noncompliant with her case plan because it gave inadequate consideration to Doe's substantial progress after entering the drug court program. Additionally, the magistrate erred by finding that the department made reasonable efforts at reunification and that termination was in J.D.'s best interest.

Because of the importance of timing in this case, a brief review of the facts with some relevant dates will first be necessary. The department filed a petition for removal of J.D. under the Child Protective Act, I.C. § 16-1603, on March 14, 2008. The principal reasons given by the department were that Doe tested positive for methamphetamine while pregnant with J.D. on October 1, 2007, and on January 24, 2008, and that Doe was arrested for possession of methamphetamine with intent to deliver on March 3, 2008. A case plan was developed and ordered by the magistrate on June 1, 2008. After a case plan review hearing, the magistrate ordered on September 26, 2008, that J.D. continue in the custody of the department because it was contrary to her welfare to remain with Doe, and the department had made reasonable efforts to prevent removal.[3] The magistrate entered another identical order on December 16, 2008, after another review hearing. On March 10, 2009, the department filed a permanency plan for termination of parental rights which was approved by the magistrate on March 19, 2009, without the need for further reunification efforts, including visitation. On March 24, 2009, the

---

[3] The magistrate based its finding that the department had made reasonable efforts to prevent removal on a progress report prepared by a case worker on August 27, 2008. This progress report does not appear in the record. The only report found in the record is from the same case worker dated March 19, 2009. That report makes only a conclusory statement that the department has made reasonable efforts to "facilitate the safe return and reunification of the family."

department filed a petition to terminate parental rights. A two-day trial was held on October 16 and 30, 2009. On November 3, 2009, the magistrate ordered that Doe's parental rights to J.D. be terminated.

A trial court may terminate a parent-child relationship when it determines there is clear and convincing evidence supporting the grounds for termination. *In re Doe*, 142 Idaho 594, 597, 130 P.3d 1132, 1135 (2006). On appeal, such a decision will be upheld unless the trial court's findings were clearly erroneous. *Id.* Therefore, an appellate court will uphold a trial court's findings if they are supported by substantial and competent evidence, even if such evidence is conflicting. *Id.* On review, all reasonable inferences are viewed in support of the trial court's decision. *Id.*

I begin my review of the magistrate's decision concerning the case plan itself as well as Doe's efforts at compliance as these two issues were critical in the resulting decision to terminate Doe's parental rights. Idaho Code Section 16-1621(1) requires the department to prepare a case plan "in every case in which the child is determined to be within the jurisdiction of the court." Subsection (3) provides that "the case plan shall set forth *reasonable* efforts which will be made to make it possible for the child to return to his home . . . [and] shall state with specificity the role of the department." (Emphasis added). *See also* 10 A.L.R. 6th 173, § 2 (2006) (providing that the Federal Adoption and Safe Families Act requires states to exercise reasonable efforts to reunify families with a primary concern for the health and safety of the child). In a case report letter provided to the magistrate, a case worker claimed that the department had exercised reasonable efforts in this case. The magistrate repeatedly found that the department had exercised reasonable efforts. However, neither the department nor the magistrate detailed exactly what efforts were made by the department and why they were reasonable.

There is a glaring absence of Idaho case law on the issue of what constitutes reasonable efforts by the department. Some courts in other jurisdictions have addressed the issue more directly. *See generally* 10 A.L.R. 6th 173. One court has held that a department does not exercise reasonable efforts by merely monitoring a parent while failing to address the major impediments to reunification, especially when the parent's record indicates the need for more intensive assistance. *See In re James G.*, 943 A.2d 53, 80-82 (Md. Ct. Spec. App. 2008). The codified policy of the Child Protective Act, found in I.C. § 16-1601, provides some guidance for what efforts are to be expended. That section provides that the health and safety of the child are

11

the primary concern, but also requires that, in the event of removal, "the state of Idaho shall, to the *fullest extent possible*, seek to preserve, protect, enhance and reunite the family relationship." (Emphasis added). At the very least, then, the department must develop a case plan that is realistic and achievable. *See Doe v. State,* 137 Idaho 758, 762, 53 P.3d 341, 345 (2002).[1] In this case, all parties are in agreement that Doe had a deeply-rooted addiction to methamphetamine. The case plan's strategy to help Doe overcome her strong addiction and be reunited with her daughter essentially required Doe to go through short-term inpatient treatment, attend community support groups and a parenting class, obtain a mental health assessment, and cease the use of drugs as well as associations with drug using friends. Additionally, Doe could meet with her daughter one hour a week. The department represented, and the magistrate accepted without further inquiry, that this constituted reasonable efforts to ensure the continuation of the family relationship to the fullest extent possible.

I disagree that Doe's case plan presented reasonable steps for Doe to become clean and sober. The requirements failed to adequately provide her with the structure and resources to overcome her addiction. This is borne out by the fact that, after Doe was placed within the structure and supervision of the drug court program in February 2009, she made substantial progress. Her substance counselor through the program testified that Doe had a rocky start, as is common in most cases. The counselor testified that he was able to address some of the underlying issues with Doe's addiction and that she had very good participation. He also testified that she was highly motivated to remain sober and had established several healthy relationships to support her recovery. Regarding Doe, he concluded that "she's not the same person that began Drug Court, not even--not even close." This testimony was corroborated by Doe's drug court probation officer who testified concerning some of Doe's difficulties early on,

---

[1]     *Doe* involved the absence of the father for the entire lifetime of the child due to incarceration. The Supreme Court noted:

> The Department trivializes Doe's efforts to have a relationship with his son. Reality must play a part at two levels: 1) Doe was severely restricted in what he could do. Within that context he tried to establish a relationship. 2) The Department did little or nothing to assist in that effort. The Department focused on the best interest of the child--laudable in the abstract but without regard for the parental rights possessed by Doe.

*Doe*, 137 Idaho at 762, 53 P.3d at 345.

12

but indicated she had been doing very well since May 2009. In addition to Doe's progress through the drug court program, she provided certification of her G.E.D., completed the required parenting classes, obtained a mental health evaluation, and completed inpatient treatment. The record indicates that, once Doe was provided with adequate structure and resources, she was able to substantially comply with the case plan requirements that were being placed upon her.

Notably, through the course of the two-day trial, the department made a continuous objection to the magistrate's consideration of any evidence of Doe's progress after the filing of its petition to terminate parental rights in March 2009. Apparently, the department would have the magistrate consider only Doe's failures. The magistrate did acknowledge Doe's successes when it found: "Since March, 2009, [Doe] has greatly improved showing signs of compliance with her drug court requirements. To her credit, she is now involved with treatment again and seems to be doing much better." The magistrate also concluded that Doe was still very early on in her recovery and J.D. need not wait indefinitely. However, Doe was making substantial progress toward recovery. In fact, the department had entered into a voluntary case plan with Doe concerning her son under which she was allowed to maintain custody. It is somewhat contradictory that the department would allow Doe the continued custody of her son on one hand while, on the other hand, move to forcefully terminate Doe's parental rights to her daughter.

In *In re Doe*, the mother had violated the conditions of her juvenile probation and received a period of juvenile detention as well as a subsequent drug-related arrest. *In re Doe*, 142 Idaho at 596, 130 P.3d at 1134. At the trial to terminate parental rights, several witnesses testified as to the mother's successes and that termination was not in the child's best interest. *Id.* at 598, 130 P.3d at 1136. The Idaho Supreme Court held that a trial court in a termination case cannot focus solely on past behavior while disregarding relevant and competent evidence. *Id.* at 597, 130 P.3d at 1135. To do so, will not constitute sufficient and competent evidence to support a magistrate's findings for termination. *Id.* Likewise, in this case, the magistrate erred by disregarding competent evidence of Doe's substantial progress and ordering the termination of Doe's parental rights.

The magistrate also erred by finding that termination was in J.D.'s best interest. Much testimony was presented at trial concerning Doe's failure to bond with her daughter J.D. In a large sense, this issue relates to the department's efforts at reunification. There is no dispute that Doe had failed to sufficiently bond with J.D. However, I believe that any child would have

difficulty bonding with its mother, drug addict or otherwise, if it were removed from her custody at seven weeks of age and allowed only a one hour visit each week. The problem is further exacerbated when one also considers that the mother was battling a pervasive drug addiction for nearly a year before she was afforded adequate structure and resources to address the problem. It was in J.D.'s best interest to be provided with, first and foremost, a healthy and safe environment. Second, it was in J.D.'s best interest to grow up with her natural mother and siblings in the family in which she was born.

During Doe's rocky start to recovery and compliance with her case plan, it is true that she missed some visitation appointments and was late for others. However, the department also made decisions which alienated her from her child such as the decision to not allow Doe's participation in J.D.'s medical appointments. Additionally, as mentioned above, once Doe was provided with adequate structure and resources, the record shows that Doe became much more responsible and made substantial progress toward creating and maintaining a healthy and safe environment to raise her children. Therefore, it was in J.D.'s best interest that the magistrate give Doe sufficient time to progress in her recovery to the point that the family unit could be maintained. Only six months had passed from the time that Doe's case plan was approved in June 2008, until the magistrate ordered the department to prepare a permanency plan in December 2008, which led to the recommendation to terminate Doe's parental rights. The Idaho Supreme Court has recognized the pressures placed upon the department to expedite its termination efforts by the courts as well as state and federal law. *See In re Doe*, 142 Idaho at 597, 130 P.3d at 1135. Six months was simply not enough time to make reasonable efforts at meaningful reunification between Doe and J.D. Accordingly, I believe the magistrate erred by finding that termination was in J.D.'s best interest.

In conclusion, I note that every termination case is difficult not only due to the potential effects to both parents and children, but also because each case presents varied facts and circumstances. As the judiciary touts the work of drug court programs and other problem-solving courts, it is disturbing that not more was done in this case to assist a mother who needed structure to overcome a difficult addiction and who later, with help, showed significant signs of improvement. The process is intended to make it difficult for the state to terminate a parent's fundamental liberty interest in raising a child. Termination should be available in those cases where, despite all reasonable efforts and after attempting to the fullest extent possible to reform a

14

misguided parent, the trial court concludes that the child's health and safety are best served by pursuing this drastic recourse.

In this case, one is left with the impression that, from the onset, Doe was primarily on her own with an unrealistic and impossible path to recovery and reunification with her daughter. Furthermore, the department appeared more concerned with preserving its case for termination than with truly assisting Doe toward recovery and doing everything possible to preserve the family relationship. Unfortunately, these observations are somewhat confirmed by the department's continuing objection to the presentation of any evidence of Doe's progress once she entered the drug court program and after the petition for termination had been filed. The Idaho Supreme Court has held that it was error for a court to impose a presumption that termination is in the child's best interests when it had been in the custody of the state for fifteen out of the last twenty-two months. *State v. Doe*, 144 Idaho 534, 536-37, 164 P.3d 814, 816-17 (2007). The Court held that such was contrary with Idaho's presumption that a natural parent should have custody of his or her child and that it was in the child's best interest to be raised by its parent. *Id.*

While the disfavored presumption was not technically applied in this case, the case plan leaves an implicit impression that it was implemented on the presumption that Doe would fail and that her parental rights to J.D. should be terminated. This does little to create confidence in the justice of the ultimate result. For these reasons, I would reverse the magistrate's order terminating Doe's parental rights to J.D. and remand for further proceedings to monitor her continued progress in the drug court program.

15